Robertson, Ch. J.
If the benefit of the decree in -the suit between the parties to this action, in the United States District Court for Pennsylvania, in equity, were properly claimed in this action by the plaintiff, it would bind the defendant, (as was held by this court when the case was formerly before it at general term,) as to the exclusive original authorship of the drama in question, and the priority of the plaintiff’s title thereto, by purchase from such author, to any derived by the defendant from or through Mr. Silsbee. The court had jurisdiction over the subject and the parties; the questions of fact, upon which such, title depended, were the same, .and either were or might have been litigated in that suit, and were necessary to its decision, and the final hearing was upon the merits. The decree made was, therefore, res judicata as to all things that were, or under the pleadings might have been, controverted in that action, whose adjudication was necessary for the final disposition of the case. But the omission from the complaint in this action of any claim of such decree as an estoppel, even on those questions, renders it very doubtful whether she could set it up in any other way than as evidence. The defendant, however, cannot set up that the payment of the sum decreed in that suit to be paid by way of indemnity to the plaintiff, conferred a license, merely because the value of a license was made • the measure of such indemnity.
The defendant, however, beyond the claim of paramount *58 title to the literary composition in question, sets up in this action that the almost universal circulation of its contents, with the acquiescence, if not authority, of the plaintiff and every proprietor .thereof, amounts to such an abandonment of it to the public as to estop any of thejm from resuming and asserting an exclusive right to the theatrical representation of such drama. It is claimed that this is sustained in this case by proof of innumerable public representations, to numerous audiences, for upward of seven years, under the plaintiff’s direction, or by her license, (when her eonnectioii with [the performance would be less perceptible to the community;) or if without such assent, then so often since its original composition, fifteen .years since, and in so many places, including distant parts of the United States and Great Britain, and by so many persons, including some who performed it from memory, as to create a presumption, first, of notice of such performances to her; second, of her indifference thereto, by reason of her failure to interfere and prevent it, or otherwise interpose' a claim of right; and, finally, of her abandonment of all- exclusive right thereto. This makes it incumbent on us to discuss, the question so presented, as it was not raised in this action when formerly before .us at general term, or.in the suit in' Pennsylvania.
The production, or what is called in the civil law “ causing to exist in rerum natura,” of an arrangement of words, whether by writing, speech, or printing, in any language, so as to convey some special ideas or thoughts, called “ a literary composition,” gives to the producer óf it an exclusive right to its enjoyment and use. The ownership of the substance whereon such words may be written or printed, by authority of or by such producer, may constitute the physical evidence of such right, but is not its basis. The written letters, like spoken sounds, are but symbols of thoughts. The communication of such sequence of words by the producer to other persons by speech, or copies of' them, renders it difficult to maintain such exclusive right *59 without prejudice to the community. It is conceded that it is mainly to be protected by preventive remedies, and then only when an express or implied reservation of it accompanies such communication, and imposes a restraint upon the hearer or recipient, preventing him from divulging it; in other words, makes it more or less of a secret.
A recovery of damages against strangers, wholly unacquainted with the ownership, although' receiving the knowledge of the contents of the composition from those who were bound not to betray them, would work great injustice, as the author or owner, who first furnished the means of invading his own right by the communication, would thereby be permitted to take advantage of his own wrong. For that reason an intent to abandon all private right has been inferred from the mode of communication. Printing being the means generally adopted for a widely diffused circulation, the delivery of a printed copy of a work to one of several subscribers, for even a limited edition of a work, has been held to surrender it to the public, although the delivery of a manuscript' copy would not. But such delivery of a printed copy may be made confidential, by a notice printed thereon, that it is for private circulation only. A limited communication of' a literary or musical composition by private lectures, recitations, or its performance, has been held not to surrender its proprietorship to the public, not only by reason of the supposed confidence reposed in the hearers, (4 H. L. Ca. 965,) but also because of the retention of ownership inferred from the smallness of the number of recipients. But where such communications are indefinitely multiplied, so as to embrace an innumerable host of hearers, there would not seem to be a great difference in principle between giving the composition to the public at once or by degrees. So that where the audience is not limited, as in the case of a public theatrical performance, the-public are held entitled to make use of that faculty, which is necessarily addressed by such representation, to wit, the memory, for the purpose of repeating *60 the contents of the play, even in performing it elsewhere, when the owner has laid no restraint upon such user of the knowledge so obtained, and retained by memory only.
A solitary decision in a suit in equity, (Macklin v. Richardson, Ambl. 694,) upholds the right to restrain a person who has obtained a copy of a play from the recollection of a spectator at its public performance, from printing, or otherwise making use of it. But that decision was suspended to await the determination of a suit at law, pending at the same time, (Millar v. Taylor, 4 Burr. 2303,) wherein the question of a copyright at common law was involved and settled in favor of its existence. But as the authority of that case, although followed in another case reported in the same volume, (Donaldson v. Beckett, 4 Burr, 2408-2417; 2 Br. P. C. Townl. 130; 17 Cobb. Parl. Hist. 953,) was entirely overthrown by a subsequent decision in the house of lords, (4 H. L. Ca. 815,) which has been followed in this country, (Wheaton v. Peters, 8 Pet. 591,) that of Macklin v. Richardson, (ubi supra) which rests upon it, must fall with it.
•We. are then without any authority to sustain the right of exercising any restraint over spectators at a public performance of a play, so as to debar them from using as much of it as they can carry away in their memory, in any way they may think proper, where its proprietor has not entered into some express or implied understanding with such spectators to the contrary. Such understanding cannot be implied as one of the ordinary terms of admission to the performance, because remembering, to a certain extent, is the natural consequence of hearing, and using such recollection naturally flows from possessing it. The right of taking notes is not one of the privileges necessarily conceded by a public performance, and the use of any such artificial aids to, or substitutes for, memory, may be restrained by a court as a violation of the terms of admission, or may be made part of the police of the place of performance, so as to justify not only its prevention, but even the expulsion of the offender. (Macklin v. Richardson, ubi *61 sup. 2 DeG. & Sm. 692. Wood v. Leadbitter, 13 Mees. & W. 838.) The difficulty of remembering a whole play, from hearing it performed, may be an obstacle to its performance by others, but it can be overcome by repeated attendances and a subdivision of labor, as was established in this case. The law does not consider it impossible, as is evident by the adoption by Justice Buller, in the case of Coleman v. Wathen, (5 Durn. & East, 245,) of the presumption, that a copy was obtained by such means, rather than from another copy, to prevent the incurring of a penalty. The violation of an udderstanding, however, by spectators, with the owner of a play, that they shall not make use of their remembrance of it to his prejudice, may be restrained upon the same principle as any other betrayal of confidence; such as the disclosure of the secrets of a business, art, trade, or mystery agreed not to be divulged. Such understanding might be created by indorsements on a ticket of admission, or notices publicly posted in the place of performance, or other modes. Such precautions are necessary to protect the exclusive right to an uncopyrighted production; otherwise they would stand on the same footing as if they were copyrighted.
The question then arises, what facilities did the plaintiff, or a prior owner, afford the defendant or others, to perform the play in question ? and not merely through whát means was he enabled to perform it. The partial copy used by him in its production, appears in the pleadings to have been obtained by him in 1858 from the representatives of a Mr. Silsbee, whom he claimed to have had a share in its authorship. If the statement in the answer, that the defendant purchased it from the widow of Silsbee, who, it alleges, brought it to this country, be disregarded as not proved, we can go no further back than Silsbee in tracing the title. He may have obtained it rightfully or wrongfully, by recollection of it, if it was performed, or, if not, by surreptitiously making a copy. There is no evidence, whether it was ever performed before it was brought here. It had *62 been performed in British possessions without the plaintiff’s consent, and might have been performed in England, and written out from recollections of persons present at the performance. The defendant was, therefore, entitled, if there was any doubt upon the subject, and it was essential to the decision of the issues, however slight the evidence or room for conjecture, to have the question submitted to the jury, whether such copy was obtained from recollections of a performance. The presumption in favor of innocence laid down by Justice Buller, in Coleman v. Wathen, (ubi sup.) could then have been applied. It was an error, therefore, to have withdrawn entirely the consideration of that question from the jury.
But the issues presented by the pleadings and the range of evidence in the case, were wider still than the mere determination of the question, whether the copy used' by' the defendant was lawfully obtained; for in case the rest of the world had acquired the right of theatrical representation by other means, the defendant would not be estopped from using such copy. • There must be some limit to the frequency of the repetition of theatrical representations of a play, the number of places at which, of persons before whom, and the period of time during which, it has been performed, before the owner will be presumed to have surrendered his right to the public; otherwise we stumble on the absurdity, that a literary composition may be presumed to be private, although every living being is familiar with it. Unless that be so, the right would last forever, and be capable of being handed down to the most remote posterity, and thus be far superior to a statutory copyright. It is a. presumption of law, that every one intends the natural consequences of his acts, and the intent alone of an act, or series of acts, which communicates to a number of persons the contents of a play, determines whether a surrender to the public was thereby accomplished. No one. could travel continually over a country, reciting for years his compositions, and thus enabling every one to repeat *63 them, without being presumed to have authorized them to do so. In that way ballads, now gems of literature, were anciently preserved, the descendants of whose authors, even .if they could be discovered, would hardly now be entitled to a literary proprietorship therein.
Such intent to make public is inferable, therefore, from such frequent and continued representations for so long a time, that the party authorizing it may be deemed estopped from denying it. Because the community can only judge from appearances; and it would be a snare to reserve a right by means of an- implied understanding, and yet do every thing to render the observance of that understanding unnecessary and useless. There must always be a tendency to the diffusion of the knowledge of the contents of a valuable literary tiomposition, beyond any limit set by its proprietor, and to their employment when communicated by him. It is incumbent upon him to check that tendency by the restraining power of courts, and otherwise, in order to preserve his rights. If he not only does not, but actually facilitates it, it would be a fraud upon the public, thus entrapped, to allow him to insist upon them.
The clear and forcible language of the learned judge, who decided the former suit between these same parties, (Cadwallader, J.) is even more applicable to endless repetitions of performances, than to a few, and I make no apology, therefore, for quoting it at length: “ The literary proprietor of an unprinted play cannot, after making or sanctioning its representation before an indiscriminate audience, maintain an objection to any such literary or dramatic representation by others, as they may be enabled, either directly or secondarily, to make, from its having been retained in the memory of the audience. * * The privileges of listening and retention by memory, cannot be restrained. When the audience is not a select one, these privileges cannot be restrained in their immediate or ulterior consequences.” But how much is such restraint to be diminished as the audience increases in number, when the *64 representation, is brought to their own places of residence, and continued as long as enough audiences can be found in each place to support the expenses of the exhibition ?
The learned judge, already referred to, did not confine the right to repeat the contents of such play to a recollection of it by the defendant, from hearing it performed under direction of the plaintiff, but extended it to a recollection by others of the audience. He confined his decision, however, to two grounds. First, that, as a matter of fact, the defendant was not enabled to perform such play from the plaintiff’s representations; and, secondly, had used corrections, additions, and interpolations made by an actor in her employ. The defendant placed his defense entirely upon the ground of superior title to the original manuscript, which was decided against him on the facts. The evidence now adduced before us, of wide spread and long continued reiterations of the play in question, was not before the court, or considered on that occasion. It is true the learned judge seems to have placed the decision solely upon the ground of want of authority from the plaintiff, because the defendant’s performance was not from memory. But I apprehend that he would have hesitated long before making the defendant liable for performing from even a surreptitious copy of a production, of which others were everywhere diffusing the knowledge by representations derived from memory. I certainly should. How far is this license to perform from memory to extend? Every one of the audience at such reminiscential performance, of course, would clearly have a right to repeat it in the same way, and so on ad infinitum. There can be no limit to the diffusion of knowledge, once let loose, whether borne on the breath of individuals or the wings of the press, however inferior its rapidity by the former mode may be.
There was also enough evidence in this case to have gone to the jury upon the question, whether the plaintiff had not so frequently performed the play in question, for such a period, and at so many places, as to warrant the conclu *65 sion of every one of ordinary intelligence, that she intended to surrender the knowledge and use of it to the public, and confine her expectations to the superiority of her mode of performing it. Or if she did not, then that by her frequent performances, she had enabled it to be so universally represented from recollections originating in such performances as to destroy her right. Also, that the copy used by the defendant was lawfully obtained by means of the recollection of representations given either by the plaintiff or some former proprietor. And such questions ought to have been disposed of by them.
The learned judge, to whose opinion I have before referred, seems to have thought that carrying away the contents of a drama by recollection was seldom resorted to, on "account of its difficulty and expense. The latter is merely that of a few nights’ attendance, and the difficulty is not very great, since the impressibility and tenacity of the memory is greatly increased by exercise, so that the “study,” as it is technically called, of an actor, enables him to perform a part when unexpectedly called upon, after á single reading. Each one only studies his own part, being guided in fitting it to the others by what are termed “ cues,” or catch words. The memory of such a confused mass is entirely technical, without being much guided by the sense, except in long passages. In this case it was proved that the play in question had been actually performed in Providence, (R. I.) after having been made up by several performers from memory. The play itself, or such of it as was written, was adapted to being easily remembered. It was short, originally being written in two acts, but was afterwards greatly curtailed in representation. It consisted of a plot, characters, situations and incidents; but the dialogues of the principal parts seemed to be almost entirely the creation of the performers. The part of a principal character (Asa Trenchard,) performed by the actor (Jefferson) who is charged with having communicated to the defendant additions made by him to it, was entirely altered *66 from the original manuscript and changed, impromptu, nightly.
The copy owned by the defendant contained only the “cues” and the “mere skeleton” of that part. A dialogue was introduced by another actor (Andrews) to which the language of the part of the other speaker was modified by him to conform. The early history of the production, from 1852 to 1858, is n.ot before us. One witness found it, in the distant British possession of Australia, public and unclaimed property. Silsbee brought his copy from England, where there is no evidence of its having been performed, and sold it in its incomplete condition to the defendant, two years after the plaintiff had bought it from the author. It may have .been performed where Silsbee or some other person saw it, and prepared the copy bought by the defendáis. Its existence for six years unperformed, to be resuscitated by the plaintiff, would be strange. It may have been performed in England, and thence reached Australia. It was represented by the plaintiff two years before the defendant bought his manuscript, and Silsbee may have prepared it from the representations of the former. The burden of proof in that respect would lie with the former, after she had made it public, according to the decision in Coleman v. Wathers, already cited (ubi supra.)
Under the plaintiff’s direction, or by her license, the play in .question was performed more than two or three hundred times, and in a dozen theatres. In Brooklyn, Buffalo, Boston, Halifax (N. S.); in two theatres in Washington (Grover’s and Ford’s); in Cumberland and Baltimore (Maryland); in Alexandria (Virginia); and in California. It was performed during seven years, and at a great many theatres since the beginning of 1865. Between 1860 and 1865 it was performed at Baltimore, Alexandria and Cumberland, and at one theatre in Washington (D. C.) apparently without the plaintiff’s license. The defendant was prevented from proving the number of times and places where the performances were 'given between 1858 *67 and-1865, when the defendant represented the play in question ; which was material in establishing an abandonment. The objection was put on the ground that the question was not confined to performances by the plaintiff’s permission. But, in fact, the more they took place without that, the proof became stronger of a relinquishment! To have allowed the diffusion of the knowledge to go on uninterruptedly, was nearly as strong evidence-of it as to have ministered to such diffusion by contant performance. The union of the two greatly increased their separate strength. Such question ought therefore to have been admitted.
Another question still remains, upon which the case also turns, in reference to the use by the defendant of additions, changes or interpolations, technically called “gags,” made by Mr. Jefferson in his part of Asa Trenohard, while in the plaintiff’s employ, and therefore claimed to be her property, and communicated by him to the defendant. This was noticed by the learned judge in his opinion before mentioned, in the suit in Pennsyvania between the same parties, where they were held to follow the ownership of the principal production as accessories, and to have been communicated to the defendant by a quasi breach of confidential relations. The question in that case being merely one of paramount title, the learned judge was probably correct in holding that the title to the accessories followed that of the principal. But if it was intended by that to hold, that although the principal was made public, no right existed of using accessories communicated in the same way by representations and memory, I should be reluctantly compelled to differ from that distinguished jurist. Such alterations as “gags” relate entirely to one part, and seem never to have been inserted in the manuscripts owned by either party; and were of course - constantly produced from memory by their author at the theatre of the plaintiff, and in like manner communicated by him to the defendant. No confidence or implied duty was broken, and no mystery of an art, trade, profession or business, unduly disclosed, where *68 the same things have been constantly produced to large indiscriminate audiences, every member of which had a right to divulge it. The person who created the phrase should not be the only one to be excluded from repeating it. There could not be a legal padlock on his memory alone. He testified that it was customary for comedians to exchange any little advantages they may have gained in their parts, from one to the other. “ That he and the defendant were old professional friends, and had been associated together.” That he gave the latter “ such hints as he would no doubt have been willing to give ” the witness, who “ had received from him courtesies of the same kind.” He also testified that such alterations, consisting of dialogue, business or fun, situations and acting, were not in the manuscript from which the play was performed, as identified on the trial, and that he never gave the plaintiff any possession of them. Most of the “ gags ” introduced in another part {Lord Dundreary) on the plaintiff’s stage, were omitted in the defendant’s performance, until restored by the author of them (Andrews) who used them at both theatres. So that these interpolations were retained in the memory of their author, from whence they were drawn to benefit a comrade and professional brother, according to the customary courtesies of the profession. The acknowledged right of so transmitting them belongs, after representation, equally to them and the original production, which would be incomplete without some such filling up. Such communication of them, alone, gave the plaintiff no additional right of action.
There may be some hardship upon authors not entitled to the benefit of a statutory copyright, in compelling them to use very great precaution before they can make, and while -making, a profitable use of their productions. But the remedy rests wholly with the national legislature.
In this case the exceptions should be sustained, the verdict set aside, and a new trial had, with costs to abide the event.
Barbour, J. concurred.