public performance or representation of the "railroad scene" in the play of "After Dark," or of any scene in substance the same as the "railroad scene" in either of the two plays, as such scene is herein defined.

———•♦•———

## N. Y. SUPERIOR COURT.

### HENRY D. PALMER agt. ROBERT M. DEWITT.

The author of an unpublished manuscript has at common law an exclusive right of property therein, the violation of which may be justly protected by injunction.

But this exclusive right pertains only to the unpublished manuscript, without copyright protection. After unrestricted publication to the world, neither the author nor his assignee, whether a foreign or domestic writer, can assert an exclusive right to property in the future use and publication of the composition..

Unrestricted representation upon the stage is a publication; and if spectators carry away in their memory the whole or any part of the play, they cannot be restrained by injunction from printing it.

*Special Term, December*, 1868.
*Before* GARVIN, *Justice.*

THIS is a motion to dissolve an injunction restraining the defendant from printing and selling printed copies of a comedy called "Play," of which the plaintiff claims to be the proprietor, by virtue of an assignment from the author. The motion is made upon the complaint and answer. It is alleged in the complaint, "that prior to the first of February, 1868, one T. W. Robertson, of London, England, an eminent author, was the composer of a comedy called "Play," and assigned to the plaintiff the exclusive right of enacting, representing upon the stage, printing and publishing, or causing, licensing or permitting to be enacted, performed, represented or produced upon the stage throughout the United States, in and to the said comedy, together with all the author's rights and privileges therein and thereto throughout the United States, and all benefits and advantages to be derived there-

from." That at the time of such assignment, purchase and sale, the said Robertson had a great reputation as a dramatic author, having produced some of the finest comedies introduced on the modern stage, among them the comedies of " Caste," " Ours," and " Society," had been eminently successful. It is also alleged that any new comedy from such an author was of very great value to the exclusive proprietor thereof, and the plaintiff, in the purchase of the comedy of " Play," anticipated great pecuniary advantage from and by reason of the celebrity and popularity of its author. And the plaintiff avers that at the time of the purchase of "Play," on 1st of Februrry, 1868, the said comedy was an unpublished composition, adapted and designed for scenic representation, and was of great literary and dramatic merit; that it had never been at that time, nor has been since, printed or published in print by the plaintiff or its author, or by any one under his sanction, permission or consent, or that of either of them, and at that time had never been represented upon any stage; that its first performance upon any stage was on the 15th of February, 1868, in the city of London, at the Prince of Wales theatre, and under the sanction of the author, but that the author did not thereby confer upon or abandon to the defendant, or to any other person, the right or privilege of printing his comedy or otherwise interfering with his right of property therein; that the plaintiff, nor the author, has never consented to the printing and publishing, or sale thereof; that on or about the 10th of February, plaintiff received a full and complete manuscript copy of the said comedy, and still owns the same, and keeps it unprinted and unpublished, and is now engaged in licensing the right to perform and enact the same; that on the 18th of February, 1868, he published in the New York Herald a notice of his right of ownership in said play, and had the same repeated in said newspaper tri-weekly during the months of February and March; that about the 25th of March, 1868, the defendant, who is a publisher in the city of New York, without the

knowledge or consent of the plaintiff, and in willful disregard of his rights as proprietor of said play, did print, publish and sell printed copies of the said play, and still continues so to do, to the plaintiff's damage; and the plaintiff alleges that copies of the play so printed and sold are identical with the comedy purchased by the plaintiff from the author that the plaintiff is liable to sustain irreparable injury by reason of the facility which defendant has afforded to managers and actors to produce said comedy by means of such printed copies.

The answer denies the plaintiff's proprietorship, and any willful intention to injure the plaintiff; claims that the play was publicly represented upon the stage in London a great number of times, and that the defendant obtained the play from those who saw and heard the representation as spectators, and that there was no prohibition in the theatres where the same was heard, nor upon the tickets of entry, against carrying away the same in the memory by those who saw and heard it.

> MR. WARREN, *of counsel, for defendant.*
> MR. BOOTH, *of counsel, for plaintiff.*

GARVIN, J.    The plaintiff in this action claims to be the assignee, purchaser and sole and exclusive owner and proprietor throughout the United States of a comedy written by T. W. Bobertson, an eminent English dramatic author, entitled " Play." The plaintiff purchased the comedy on or about the first of February, 1868, and received the copy of said play in manuscript on or about the tenth of February, and alleges the same has never been printed or published with the consent of the plaintiff or the author.

It was represented for the *first time* on the stage in London, at the Prince of Wales' theatre, on the 15th of February, 1868. That during the latter part of February and the whole of March, the plaintiff had a notice published in the

New York Herald tri-weekly, of his right of ownership in the play. The defendant on the 25th of March, in willful disregard of the rights of plaintiff and without his consent, published and sold identical copies of "Play," thus owned by the plaintiff to his great damage and irreparable injury, and depriving him of all advantages and profits to be made thereby.

It is not pretended that either the plaintiff or the author had an American copyright in the comedy in question; neither could either have such a right—a foreign copyright would not avail the plaintiff here. There can be no copyright in a published work at common law; copyright exists only by statute *Wheaton* agt. *Peters* (8 *Peters*, 499). The plaintiff must, therefore, stand upon his common law right of literary property in "Play," as the assignee of the author to its exclusive proprietorship in the United States, with the right to enforce it as against others who claim to publish and circulate for their own profit and advantage. Two principles are well settled upon authority :

*First.* The author of an *unpublished* manuscript has in it at common law an exclusive right of property; the violation of which may justly be protected by injunction. This is the language of the text writers, and the decisions upon the subject are uniform and clear. (8 *Peters, U. S. R.* 499; 4 *Duer, S. C. R.* 385.)

*Second.* This exclusive right pertains only to the unpublished manuscript, without copyright protection, but after unrestricted publication to the world; neither the author nor his assignee, whether a foreign or domestic writer, can assert an exclusive right to property in the future use, and publication of the composition. The important question in this case is, whether there was a publication or communication of the comedy by the author, or his assignee. Every communication, says CADWALADER, in *Kean* agt. *Clark*, of a knowledge of the contents unless restricted of a manuscript, is more or less a publication. And this able judge further

says, " an act which renders the contents of a manuscript in any mode or degree an addition to the store of human knowledge, is a publication." It has been expressly held by this court in *Keene* agt. *Clark*, that at common law " the author or proprietor of an uncopyrighted literary composition parts with the right to the exclusive use and enjoyment of its contents by *communicating* them to others," without some concomitant reservation expressed or implied from the circumstances. This is holding, in other words, that an author has no exclusive property in a *published* work, or one communicated to the public, except under some statute. (*Wheaton* agt. *Peters ; Bartlett* agt. *Crittenden ;* 5 *McLean's, C. C. R.* 32.)

The only question, therefore, is that of *publication.* As this question is presented, the fact of foreign authorship can make no difference. There being no copyright interest, plaintiff's case must rest upon his common law rights. After publication his exclusive right ceases to exist.

Such publication may be either by words, by writing, printing in newspapers, magazines, or by lectures, sermons (oral or written), or by dramatic represenation. If, in any of these modes, the public become possessed of the contents of a manuscript, without restrictions express or implied, it must be regarded as such a publication as divests the author of an exclusive property in the work, whatever it may be. It is averred in the complaint that the comedy in question was represented on the stage on or about the 15th of February, 1868, in London. This one fact brings the case clearly within the rule laid down in the case heretofore referred to in this court. Doubtless, there was a series of representations of the play. There is no pretence of any restriction upon its use by those who witnessed the representation ; a dramatic representation is publication or communication of the contents. If this is not a publication, copyright would be worthless, compared with the common law property in, and perpetual right to, exclusive representation of any pro-

duct of the author. The first is limited to a few years the latter would be perpetual; copyright is confined to the citizen and resident—the other applies to all. There is no valuable exclusive right in the works of a foreign author that can be enforced, not even in their re-publication, though by the custom of trade other publishers refrain from publishing rival editions thereof.

The plaintiff avers a representation on the stage in London, and the defendant insists in his answer that "Play" was publicly represented upon the stage, in London a great number of times, and that the defendant obtained it from those who saw and heard the representation as spectators, and that there was no prohibition in the theatre where the same was heard, nor upon the tickets of entry, against carrying it away in the memory. The defendant also denies any wilful intention to injure the plaintiff. We must, therefore, assume the defendant possessed himself of "Play," by means not *unlawful* in themselves, through those who saw and heard it represented in London, and published it in this country. If the defendant had obtained a copy from a printed book, magazine or newspaper, there can be no doubt of his legal right to multiply copies and sell them to the public. How can there be any doubt of the same right in cases where he obtains the contents from those who learn and carry away in memory a comedy or play from seeing and hearing its unresricted and unconditional representation upon the stage? All our national legislation, as well as that proposed for the benefit of foreign authors, proceeds upon the conceded principle that the work of a foreign author brought here may be appropriated by any person without any compensation whatever being made to the author. This was conceded by the committee of the senate in the report made in 1837, by its distinguished chairman, Mr. Clay, where an attempt was made to confer the benefits of our laws upon British and French authors. A bill accompanied the report which failed. The enactments of congress, passed in 1831,

declare in effect that the only persons entitled to copyright, shall be such authors as are citizens and residents, and their assignees, "and if the assignee takes his title before the author has come to reside, he takes from a person who is not within the privilege of the statute, and has nothing to confer." (*Curtis on Copyright*, 143.) The ninth section of the same act prohibits the publication of manuscripts without consent, and authorizes the courts by injunction to restrain such publication of any manuscript; but the eighth section expressly excludes that section from any application to works written or composed by any person not a citizen nor resident of the United States; thus recognizing the principle in this country that when the foreign author communicates, without restrictions, the contents of his manuscript or work to others, he divests himself of his exclusive property in it. In other words "the statute has taken away the common law rights derivable from a non-resident alien as soon as the work is published." (*Curtis on Copyright*, 143.)

All the title the assignee can have is the common law title to an unpublished manuscript, but in one lawfully made public he has no other title than such as the author possessed after publication. The main question in this case was substantially decided by this court in the case of *Keene agt. Clark* (5 *Robertson*, 38); there it was expressly held, "where the spectators of a public performance have not entered into some express or implied understanding with its proprietor, limiting the use they may make of the knowledge derived from being present at such performance, *they cannot be restrained as to the use by them* of so much of it as they can retain and carry away in their memory."

I do not see how this case can be distinguished in principle from that rule thus laid down.

The plaintiff has failed to make a case for the interference of the court by injunction. Courts must administer the law as they find it. This may be a case of great hardship for the plaintiff, but the remedy is to be found in national legisla-

Palmer agt. Dewitt.

tion. The same difficulty exists in relation to the re-publication of the uncopyrighted works of those who have enriched the world by their contributions to the literature of the republic of letters, as well as to those who publish editions of foreign authors; yet these defects in the legislation of the country have continued for many years. In the absence of any international law of copyright it is difficult to see how foreign authors, their assignees, or publishers of foreign literature can be protected.

The injunction order in this case must be dissolved with $10 costs.