## SARONY *v.* BURROW-GILES LITHOGRAPHIC CO.

### *(Circuit Court, S. D. New York.* April Term, 1883.)

1. CONSTITUTIONALITY OF STATUTE—WHEN COURT WILL DECLARE VOID.
    The court should hesitate long, and be convinced beyond a reasonable doubt, before pronouncing an act of congress invalid. The argument should amount almost to a demonstration. If doubt exists, the act should be sustained,—the presumption is in favor of its validity.
2. COPYRIGHT—REV. ST. § 4952—PHOTOGRAPHS AND NEGATIVES.
    The act of congress (Rev. St. § 4952) granting copyright protection to photographs, and negatives thereof, is not so clearly unconstitutional as to authorize the court at *nisi prius* to declare it invalid.
3. SAME—INSERTING IN COPYRIGHT, NAME, AND DATE.
    The object of inscribing upon copyright articles the word "copyright," with the year when the copyright was taken out, and the name of the party taking it out, (Laws 1874, c. 301,) is to give notice of the copyright to the public; to prevent a person from being punished who ignorantly and innocently reproduces the photograph without knowledge of the protecting copyright.
4. SAME—INITIAL OF CHRISTIAN NAME AND FULL SURNAME.
    Inserting in such a notice the initial of the Christian name and the full surname is a sufficient compliance with the law; it does not violate the letter of the law, and accomplishes its object.

This was an action at law for the violation of the plaintiff's copyright of a photograph of Oscar Wilde, which the defendant had copied by the process known as chromo-lithography. It was admitted on the trial that the plaintiff had taken all the steps required by law to secure the copyright except to insert his Christian name in the notice, and there was no dispute as to the number of copies printed by the defendant, the value thereof, or the number on hand. The notice of copyright on the plaintiff's photographs was as follows: "Copyright, 1882, by N. Sarony." A jury was waived, and the case was argued upon questions of law only, which appear in the opinion.

*Guernsey Sackett* and *A. T. Gurlitz,* for plaintiff.

*Stine & Calman* and *D. Calman,* for defendant.

COXE, J. This is an action to recover—pursuant to section 4965 of the Revised Statutes—for the infringement of a copyright of a pho-

tograph. Two defenses are interposed: *First*, that the act securing copyright protection to photographs is unconstitutional; *second*, that the plaintiff, in printing upon the photograph the initial letter of his Christian name, N., instead of the name itself—Napoleon—has not given the notice required by the statute.

- Article 1, § 8, of the constitution vests in congress the power to make laws "to promote the progress of science and useful arts by securing, for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries."

· Upon the authority of this constitutional grant congress extended, or assumed to extend, copyright protection to "any citizen  *  *  * who shall be the author, inventor, designer, or proprietor of any  *  *  * photograph or negative thereof." (Section 4952, Rev. St.)

The contention of the defendant, briefly stated, is this: That there was no constitutional warrant for this act; that a photographer is not an author, and a photograph is not a writing. The court should hesitate long and be convinced beyond a reasonable doubt before pronouncing the invalidity of an act of congress. The argument should amount almost to a demonstration. If doubt exists the act should be sustained. The presumption is in favor of its validity. This has long been the rule—a rule applicable to all tribunals, and particularly to courts sitting at *nisi prius*. Were it otherwise, endless complications would result, and a law which, in one circuit, was declared unconstitutional and void, might, in another, be enforced as valid.

The result of a careful consideration of the learned and exhaustive briefs submitted, and of such further research and examination as time has permitted, is that I do not feel that clear and unhesitating conviction which should possess the mind of the court in such cases. Many cogent reasons can be and have been urged in favor of the validity of the statute. It is, however, sufficient for the purposes of this case to say that in the judgment of the court the question is involved in doubt. This view is sustained by a recent decision of the judges of the eastern district of Pennsylvania, where the precise question was under consideration. The case (*Schreiber* v. *Thornton*) is not yet reported,[1] but the facts may be found in *Schreiber* v. *Sharpless*, 6 Fed. Rep. 175, where there was a controversy evidently growing out of the same transaction. -

· Regarding the other defense, above stated, I have little doubt. The object of the statute was to give notice of the copyright to the public; to prevent a person from being punished who ignorantly and innocently reproduces the photograph without knowledge of the protecting copyright. It would be too narrow a construction to say that the plaintiff, when he placed "N. Sarony" upon the card, did not comply with the terms of the statute requiring "the name of the party" to be placed there. If the letter of the law is not violated,

---

[1] See *post*, p. 603.

and its object accomplished, it is enough.    The strict technical rules of pleading in the criminal courts furnish but slight analogy for the guidance of the court in determining what interpretation shall be given to the statute.

The English courts, construing an act very similar in terms, have frequently upheld notices of copyright obnoxious to all of the defendant's criticisms.    Although innumerable notices have in this country been worded in the precise form adopted by the plaintiff, and many of these copyrights and notices have been the subject of judicial investigation, the precise question here presented, though it might have been raised, has not apparently been decided.    No American authority directly in point has been cited by counsel or found by the court.

It follows that the plaintiff is entitled to judgment, pursuant to the terms of the stipulation.

---

LITERARY PROPERTY AT COMMON LAW.    At the common law an author had the sole right of first printing and publishing for sale his writings;[1] yet, after such publication made by him, it has been doubted whether he possessed any property rights in the production which could be infringed by republication by a stranger.    Such, at any rate, seems to have been the opinion of the supreme court of the United States,[2] although the house of lords, by a vote of seven to four, laid down the proposition that the author and his assigns had the sole right of printing and publishing in perpetuity by the common law.[3] But copyright protection was secured in England by 8 Anne, c. 19, and in this country in 1790, when congress passed the first of our copyright acts.    And it is now agreed, both in England and in this country, that copyright exists only by statute;[4] that an author has no exclusive property in his published works, except when he has secured and protected it by compliance with the copyright laws of the United States.[5]    "When a person enters the field of authorship he can secure to himself the exclusive right to his writings by a copyright under the laws of the United States.    If he publishes anything of which he is the author or compiler, either under his own proper name or an assumed name, without protecting it by copyright, it becomes public property, and any person who chooses to do so has the right to republish it, and to state the name of the author in such form in the book, either upon the title-page or otherwise, *as to show who was the writer or author thereof.*"[6]

WHO ARE PROTECTED BY COPYRIGHT.    The proprietor or owner of a work has not, in that character alone, any right of copyright.    It is only to authors and inventors, or to persons representing the author or inventor, that congress has any authority to grant a copyright.    And when a person comes into court, asking for the protection of a copyright, it is necessary for him to show that he is the author or inventor of the work, or that he has an exclusive right, lawfully derived from the author or inventor.[7]    To constitute one an author,

[1] Millar v. Taylor, 4 Burr. 2303, (1769;) French v. Maguire, 55 How. Pr. 471; Boucicault v. Fox, 5 Blatchf. 88, 97.

[2] See Wheaton v. Peters, 8 Pet. 591, 657.

[3] Donaldson v. Becket, 4 Burr. 2408.

[4] Jeffreys v. Boosey, 4 H. L. 838; Reade v. Conquest, 9 C. B. (N. S.) 763; Wheaton v. Peters, 8

Pet. 591; Parton v. Prang, 3 Cliff. 537; Rees v Peltzer, 75 Ill. 475, 478.

[5] Clayton v. Stone, 2 Paine, 382; Bartlett v. Crittenden, 5 McLean, 32; Pulte v. Derby, Id. 328; Stowe v. Thomas, 2 Wall. Jr. 547.

[6] Clemens v. Belford, 14 Fed. Rep. 728, 730.

[7] Greene v. Bishop, 1 Cliff. 186, 198; Little v. Gould, 2 Blatchf. 181.

he must, by his own intellectual labor applied to the materials of his compo
sition, produce an arrangement or compilation new in itself.[1]

DIFFERENCE BETWEEN COPYRIGHT AND LETTERS PATENT. In *Baker* v.
*Selden*,[2] decided in the United States supreme court in 1879, Mr. Justice
BRADLEY stated and illustrated the difference between a copyright and letters
patent. The complainant had copyrighted a book explaining a particular sys-
tem of book-keeping, to which book were annexed certain forms or blanks,
consisting of ruled lines and headings illustrating the system, and showing
how it was to be used and carried out in practice. It was claimed that the
copyright protected the system, because no one could use the system without
using substantially the same ruled lines and headings which he had appended
to his book in illustration of it. The court held otherwise, and that there
was a clear distinction between the book as such and the art which it was
intended to illustrate. The copyright protected the book, but the protection
of the art was within the province of letters patent. " To give to the author
of the book an exclusive property in the art described therein, when no ex-
amination of its novelty has ever been officially made, would be a surprise
and a fraud upon the public."

NOM DE PLUME AS A TRADE-NAME OR TRADE-MARK. In *Clemens* v. *Bel-
ford*,[3] better known, perhaps, as the " Mark Twain " case, the novel idea
was advanced that an author who had not copyrighted his work had an ex-
clusive right to his literary property under the law applicable to trade-
marks, upon the theory that the assumed name under which he had written
was a trade-name or trade-mark. This ingenious idea was very seriously
urged upon the attention of the court, but all to no purpose; and it was laid
down that the invention of a *nom de plume* gave a writer no increase of right
over another who used his own name; that an author could not, by the adop-
tion of a *nom de plume*, be allowed to defeat the well-settled rules of the com-
mon law, that the publication of a literary work, without copyright, was a
dedication to the public, after which any one might republish it. " No pseu-
donym, however ingenious, novel, or quaint, can give an author any more
rights than he would have under his own name."

LECTURES. The delivery of a lecture is not such a publication of it as de-
prives the lecturer of his property rights therein.[4] And it seems there is no
right to report phonographically or otherwise a lecture which has been de-
livered before a public audience, and which the lecturer desires to use again in
like manner. In England it was provided by statute that no person, allowed
for a certain fee to be present at any lecture delivered at any place, should be
deemed to be licensed to publish such lecture on account of having been per-
mitted to attend the lecture, etc.[5]

ABRIDGMENTS. Abridgments are considered to be in the nature of new
and meritorious works, and if done in good faith they constitute no violation
of copyright.[6] Where books are only colorably shortened the rule would be
different.[7]

TRANSLATIONS. For a long time considerable doubt was entertained as to
whether the mere act of giving to a literary composition the new dress of an-
other language entitled one to the protection of copyright. But it is now

[1] Atwill v. Ferrett, 2 Blatchf. 39, 46; Gray v.
Russell, 1 Story, 11.

[2] 101 U. S. 99.

[3] 14 Fed. Rep. 728.

[4] See Crowe v. Aiken, 2 Biss. 208; Keene v.
Kimball, 16 Gray, 545, 551; Palmer v. De Witt,
47 N. Y. 532.

[5] 5 & 6 Wm. IV. c. 65. See Abernethy v.
Hutchinson, 3 L. J. Ch. 209.

[6] Gyles v. Wilcox, 2 Atk. 141; Dodsley v. Kin-
nersley, Ambler, 403; Whittingham v. Wooler, 2
Swanst. 428, 430; Tonson v. Walker, 3 Swanst.
672.

[7] See Cop. Copyr. 37.

well settled that a translator may copyright his translation.[1] It is no infringement of the copyright to translate a work which the author has already had translated into the same language, although he may have secured a copyright for that translation.[2] In the case first cited in the above note, Mr. Justice GRIER said: "To make a good translation of a work often requires more learning, talent, and judgment than was required to write the original. Many can transfer from one language to another, but few can translate. To call the translations of an author's ideas and conceptions into another language a *copy* of his *book*, would be an abuse of terms, and arbitrary judicial legislation."

MUSICAL COMPOSITIONS. In *Thomas* v. *Lennon*[3] the composer of an oratorio permitted the words and vocal parts of his oratorio, set to an accompaniment for the piano, to be published in a book. This publication contained all the melodies and harmonies of the original oratorio. It had in the margin references to the particular instruments which were to be employed in playing the different parts of the piece, or many of them. Two questions were involved in the case. The first was, whether the publication of the book, with the score for the piano and the marginal notes, gave to every one the right to reproduce or copy the orchestral score if he could. And it was answered in the negative. And the second question was, whether a new orchestration, not copied from the original by memory, report, or otherwise, but made from the book, was an infringement of the plaintiff's rights. In answering this question the court said: "An opera is more like a patented invention than like a common book; he who shall obtain similar results, better or worse, by similar means, though the opportunity is furnished by an unprotected book, should be held to infringe the rights of the composer."[4]

DRAMATIC COMPOSITIONS. The representation upon the stage of an unprinted work is not a publication which deprives the author or his assignee of his property rights therein, and does not interfere with his claim to obtain a copyright therefor.[5] As the mere representation of a play does not of itself dedicate it to the public, it has been held, where a copy of such a play has been unlawfully made by persons witnessing its performance, and who have reproduced it by phonographic report or notes, that its representation from such copy will be restrained by injunction.[6] In 1860 the supreme court of Massachusetts, in *Keene* v. *Kimball*,[7] decided "that the literary proprietor of an unprinted play cannot, after making or sanctioning its representation before an indiscriminate audience, maintain an objection to any such literary or dramatic republication by others, as they may be enabled, either directly or secondarily, to make from its being retained in the *memory* of any of the audience." In 1882 the same question again came up in this same court in *Tompkins* v. *Halleck*.[8] The whole question was elaborately argued, and very carefully considered, being rightly deemed one of great importance. An injunction was asked to restrain the representation of a drama called "The World," which had been reproduced by a person who had attended the representation of the play at Wallack's theatre in New York on several occasions, and on each occasion had committed as much of the play as he could to mem-

[1] Millar v. Taylor, 4 Burr. 2348; Burnet v. Chetwood, 2 Mer. 441; Prince Albert v. Strange, 2 De G. & S. 693; Wyatt v. Barnard, 3 Ves. & B. 77; Emerson v. Davies, 3 Story, 768, 783; Shook v. Rankin, 6 Biss 480.

[2] Stowe v. Thomas, 2 Wall. Jr. 547. See Murray v. Boque, 17 Jur. 219; 1 Drew, 353.

[3] 14 Fed. Rep. 849.

[4] See, also, to same effect, Boosey v. Fairlie, L. R. 7 Ch. Div. 301; affirmed, 4 App. Cas. 711.

[5] Roberts v. Myers, U. S. C. C. Mass. Dist. 23 Law Rep. 396; Keene v. Kimball, 16 Gray, 545.

[6] Boucicault v. Fox, 5 Blatchf. C. C. 87; Shook v. Daly, 49 How. Pr. 366; Palmer v. De Witt, 2 Sweeney, 530; 7 Rob. 530; 36 How. Pr. 222; and 47 N. Y. 532; French v. Maguire, 55 How. Pr. 471, Shook v. Rankin, 6 Biss. 477; Boucicault v. Wood, 2 Biss. 34; Crowe v. Aiken, Id. 208.

[7] 16 Gray, 545.

[8] 133 Mass. 32.

ory, and had then dictated it to another until the copy was complete. It was not shown that any notes were taken in the theatre. The court overruled *Keene* v. *Kimball*, and granted an injunction restraining the representation of a play, which had not been copyrighted, from a copy obtained by a spectator attending a public representation by the proprietor for money, and afterwards writing it from memory. See, to the same effect, *French* v. *Connelly.*[1] There are to be found *dicta* to the contrary, which need not be here considered. They are believed to be based on *Keene* v. *Kimball*.

REPORTS—JUDICIAL DECISIONS. It is laid down that any person who employs another to prepare a work may, by virtue of the contract of employment, become the owner of the literary property therein.[2] Consequently, the people who employ and pay judges are said to be the rightful owners of the literary property in the opinions written by them, and the United States government might secure to itself copyright in the decisions pronounced in the federal courts, while the several state governments have the same right as to the opinions announced by the judges in the state courts. It is settled that no reporter has or can have any copyright in the written opinions of a court, and that the judges cannot confer on him any such right.[3] All that the reporter can copyright is his own individual work—the head-notes, the statement of the case, analysis or summary of the arguments of counsel, the index, etc.[4]

NEWSPAPERS AND MAGAZINES. In England there is a provision relating to copyright in magazines, reviews, and other periodicals.[5] Newspapers are not expressly mentioned in the act, but it is held that one may have copyright therein.[6] In the United States there is no express provision in the copyright law as to newspapers and magazines, but the opinion is that there is nothing in the law of copyright to prevent valid copyright from vesting in a magazine or a newspaper.[7]

PHOTOGRAPHS. In *Wood* v. *Abbott*,[8] a photograph was held not to be a *print, cut,* or *engraving* under section 1 of the act of 1831. But in 1865, congress, acting upon the authority of the constitutional provision set forth in the decision in the particular case, extended copyright protection to photographs by expressly including them among the articles for which copyright was provided. Section 4952, Rev. St.

In England it has been provided by statute that the author, being a British subject or resident within the dominions of the crown, of every original painting, drawing, and photograph, shall have the sole and exclusive right of copying, engraving, reproducing, and multiplying such painting or drawing, and the design thereof, or such photograph, and the negative thereof.[9] Paintings, drawings, and photographs were the last of the branches of the fine arts to be recognized as worthy of copyright protection in England. Previous to the adoption of the above provision, an act had been passed giving copyright in sculptures and engravings. And in most European countries copyright protection has been extended through the whole range of the fine arts.[10]

Upon the question raised in the principal case, as to whether a photographer is an author, and a photograph a writing, within the meaning of the constitutional provision vesting power in congress to pass copyright laws, it ap-

1 N. Y. Week. Dig. 196.

2 Drone, Copyr 162.

3 Wheaton v. Peters, 8 Pet. 668.

4 Wheaton v. Peters, supra; Backus v. Gould, 7 How. 798; Little v. Hall, 18 How. 165; Paige v. Banks, 7 Blatchf. 152; Little v. Gould, 2 Blatchf. 165, 362; Paige v. Banks, 13 Wall. 608; Myers v. Callaghan, 5 Fed. Rep. 726.

5 5 & 6 Vict. c. 45, § 18.

6 Cox v. Land Water Journal Co. L. R. 9 Eq. 324; Platt v. Walter, 17 L. T. (N. S.) 159; Ex parte Foss, 2 De G. & J. 239

7 Drone, Copyr. 169.

8 5 Blatchf. 325.

9 25 & 26 Vict. c. 68.

10 Cop. Law Copyr. 388.

pears that grave and serious doubts may be entertained. It seems that the court, in the principal case, was not convinced beyond a reasonable doubt that a photograph was not a writing. There was no escape, therefore, from holding the law constitutional.

But, laying aside the constitutional question involved, the question may be raised whether a photograph deserves copyright protection at all. The answer must depend upon whether it constitutes artistic work or not. This question has been the subject of considerable consideration in France, and is fully discussed in Pouillet's *Propriete Litteraire et Artistique.* Through the kindness of *Mr. William Alexandre Heydecker, of Brooklyn, New York,* who has taken considerable interest in copyright litigation, and made an excellent translation of the chapter on Property in Photographs, the FEDERAL REPORTER is enabled to present the substance of that discussion:

"The question as to whether the products of photography constitute artistic works or not, and are protected by the law of 1793, has been much discussed. Several theories have been advanced. It has been maintained, absolutely, that the law of 1793 does not apply to photography. M. Thomas, at the time imperial advocate, speaking of the subject before the tribunal of the Seine, urged this view as follows:

"'The law of 1793 has taken a certain number of arts; it has recognized that, in general, no productions were obtained in their domains without genius, and none ever without a certain labor of the mind; it has provided that these deserve protection; it has specified them, it has enumerated them, and it has protected equally, and I may almost say blindly, all their products. The law of 1793 protects paintings; it protects without distinction all such products, good or bad,—the immortal works of genius, or the ephemeral and grotesque conceptions of the most idle fantasy. The judge has naught to do with the degree of perfection of the product; the counterfeited object is a painting; that is sufficient, and without this the law would be as impracticable as it would be dangerous. If, therefore, photography were protected by the law of 1793, as it could only be for the same reasons as paintings, it would be protected without any distinctions, and without the judge having to determine the artistic value. * * * The law of 1793 does not protect the labor of thought previous to execution; not that kind of invention which is the work in the mind alone, but it protects the mental labor in its material product. The law of 1793 is essentially a practical law; it protects the vendible, the commercial product as it comes from the hands of an intelligent man, who, looking at the practical side of things, asks the law to enable him to live by his labor. But, if the law does not protect the thought without the execution, so in all the arts which it does protect this intervention of intelligence, as the director in the execution, is always to be found. It is never a purely material labor; it is always the intelligence of man expressing what his intelligence has conceived, guiding his brush or his graver, and contending with them against material difficulties. If photography, as a work of intelligence and of mind, is to be protected, it is, then, not only in the search for the subject that the intervention of intelligence and of mind ought to be found; especially will it be necessary that, in the execution, should also be found this intelligence of man acting upon the instrument. Is that what takes place? All of the intellectual and artistic work of the photograper is anterior to the material execution; his mind or his genius have nothing to do with this execution; up to the point where the photographer can be compared to the painter, by the creation of his work in his imagination, the law does not yet afford protection; and when the idea is about to take shape as a production,—when the protection of the law is about to extend to this production,—no comparison is possible. On the one hand, the painter continues his work; his intelligence directs his hand; he corrects his first thought, he modifies it, he perfects it,

and up to the last moment he impresses on it the stamp of his own personality. On the other hand, the photographer erects his apparatus, he thenceforth remains a complete stranger to what is taking place; light does its work: a splendid but independent agent has accomplished all. The man may disappear at the beginning of the operation; it will, nevertheless, be performed without the assistance of his intelligence or his mind; his personality will be lacking to the product at the only time in which, according to the spirit of the law, this personality could afford him any protection. Therefore, from the legal point of view, photographs are not products of the intelligence and the mind, susceptible of being protected by the law of 1793.'

"Thus it has been adjudged (1) that the products obtained by the help of photography do not present the essential characteristics of works of art; though they require a certain degree of skill in the use of the apparatus, and show at times the taste of the operator in the choice and arrangement of the subject or in the pose of the model, they are yet but the result of mechanical process and of chemical combinations which reproduce mechanically the material objects, without the artist's talent being necessary to obtain them. Trib. Civ. Seine, 12 Dec. 1863, aff. Disderi Pataille, 63, 396.' (2) That even though it be necessary, in order to obtain fine photographic proofs, to have gone through a certain course of study on these subjects, and even though the talent of the operator may contribute much to the success of the portraits or views which are desired, it is none the less certain that these products or views are mechanically made, by the action of light upon certain chemicals, and, in this operation, genius can have no effect on the result to be obtained; whence the consequence that photographic productions cannot be brought under the category of works of art protected by the law of 1793. Trib. Corr. Seine, 16 Mars, 1864, aff. Masson, Pataille, 64, 227.

"*Second Theory.* It is maintained, in opposition to the first, and in as absolute a manner, that the products of photography constitute productions of the mind in the sense of the law, and should be, for this reason, protected by it. 'Article 1 of the law of 1793,' argued M. l'avocat imperial Bachelier, in another case, 'contains an enumeration, but article 7 contains the real spirit of the law; what it protects is the work, and the work alone. A photograph is a design, for it is a reproduction of nature by a play of light and shade. It is argued that photography'cannot be protected by a law which antedates it by nearly 60 years. That does not appear conclusive. What the law protects is the picture—the work; and the result of photography is a picture, no matter what the process. Drawings obtained by means of the diagraph and pantograph have been considered works of art, and no one ever thought of maintaining that the process took from the drawing its artistic character, because, in fact, it is only the result that is important. It cannot be denied that photographic productions are often admirable pictures, though mechanical means are used. The art is in the exercise of the will in the choice of the subject; of the hour at which to obtain certain effects of light; all that is the creation of the man who reproduces nature, and never will it be true to say that there is mechanical action only.'

"M. A. Rendu, the eminent advocate of the Cour de Cassation, while defending before the Cour Supreme a decree of the Cour de Paris, expressed himself thus: 'Artistic property is governed by the law of 1793, and by the articles 425 and 427 of the Penal Code. Without doubt these laws could not provide specifically for all advances in the domain of art; art, like its object, is infinite; but, nevertheless, they are not confined to what is already known, because they provide for "every production of the mind and of genius which belongs to the fine arts," and they insure beforehand, to the author of any work, the exclusive right of reproducing it. The Cour Supreme has given to these laws the widest range. It has, by numerous decrees, prescribed a

distinction dear, without doubt, to certain artists of the first rank, true from a purely speculative stand-point, but inexact in the reality of things, and inadmissible from a legal point of view: the distinction between the arts truly so-called and the industrial arts. In our present condition of civilization it, must have been recognized that every work offering by its form and figure an impress of the personality of its author,—that every work worthy of being called a production of the human mind,—is legally a work of art, whether it be reserved for the admiration of people of taste, or destined to strengthen or embellish some industry. A blessed and fruitful alliance has, in our day, been consummated between art and industry. The latter is not only to satisfy material necessities, but the sentiment of the beautiful, and in order to do this it must address itself to art. Thus it is not art which is lowered, but industry which is raised and ennobled. * * * The human intelligence, even in the domain of art, can produce nothing without material assistance; though man's help be a tool, a machine, another's hand, he does not the less produce a work of art, if he continues to exercise the faculties which are concerned in that art: sentiment, mind, taste. When the sculptor makes use of the precision compass, when the draughtsman employs the reducing mirror or the *chambre claire*, it is always the thought of the artist which directs the instrument,—which guides and inspires the material means. Thought retains its supreme role. In photography, the apparatus takes the place, though not entirely, of hand labor,—the material part of the labor,—but it leaves to the artist, to its fullest extent, the labor of the mind.'

"Thus it has been adjudged, in this sense, that photographic images are pictures. Whatever may be their æsthetic value,—however great may have been the part played by the agents pressed into his service by the operator,—it is certain that there yet remains to him an important part: he determines the aspect under which the subject of the picture is to be presented to the luminous ray; he disposes the lines, and gives evidence, in a certain measure, of taste, of discernment, of skill. The work which, without the exercise of these various faculties, would not be brought forth, may thus be justly called a work of the mind, and protected on this ground by the law of 1793. Paris, 12 Juin, 1863, aff. Meyer et Pierson, Pataille, 63, 225.

"*Intermediate Theory.* Between these two theories there is an intermediate one. The propositions enunciated are not contested. It is recognized that, in photography, the apparatus takes a prominent place; but, at the same time, it is not denied that in certain cases the work of the photographer reaches a perfection, a degree of finish, which makes of it a veritable picture. This view leaves, therefore, to the tribunals the matter of deciding, according to circumstances, whether the photographic reproduction is or is not a work of art. This theory is founded upon the following decisions: (1) That photographic pictures should not be necessarily and in every case considered destitute of all artistic character, nor ranked among the purely material works; in fact, these pictures, though obtained by the help of a camera and under the influence of light, may be, within limits and to a certain degree, the product of the thought, of the mind, of the taste, and of the intelligence of the operator; their perfection, independently of the manual skill, depends largely in the reproduction of landscapes, upon the choice of the point of view, upon the combination of effects of light and shade, and, besides, in portraits, upon the pose of the subject, upon the arrangement of the costume and accessories,—all of them matters concerning the artistic sentiment, which give to the work of the photographer the stamp of his personality. Paris, 10 Avr. 1862, aff. Meyer et Pierson, Pataille, 62, 113. (2) That the law, not having defined the characteristics which constitute, in an artistic product, a creation of the mind or of genius, it appertains to the judges of the fact to declare whether the product

submitted to their investigation is, by its nature, one of those works of art which the law of 1793 protects; in particular, the decision by which the judges of the fact decide that a photographic portrait is a production of the mind coming under the terms of the law, is not under the control of the Cour de Cassation. Rej. 28 Nov. 1862, aff. Meyer et Pierson, Pataille, 62, 419. (3) That if, in general, the reproduction of a picture or of a portrait by photographic process may not constitute a work of art in the spirit of the law, it is otherwise when there is joined to the ordinary labor of the photographer that of the designer, or any other artistic combination; in particular, the fact of a photographic negative having been touched up by a draughtsman and having undergone important modifications, gives to it, unquestionably, the character of a work of art. Paris, 29 Avr. 1864, aff. Duroni et Muller, Pataille, 64, 235. (4) That if the photographic products are not necessarily works which should be classed in the category of fine arts, they can be considered as such, and be protected by the law of 1793, when they are invested with the characteristics exacted by that law; particularly, in a portrait, the pose, the arrangement of the clothing, and the accessories, may give to the work the imprint of the personality of the photographer, and place him under the protection of the law. Paris, 6 Mai, 1864, aff. Masson, Pataille, 64, 232.

"*Our Opinion.* Of these three theories we do not hesitate, so far as we are concerned, to adopt the second; but the last, especially, seems to us altogether inadmissible. It may be argued that the work of the photographer is or is not protected by the law, and, without agreeing with those who maintain the negative, we, at least, understand their view. As to the intermediate opinion, it is evidently contrary to the letter as well as to the spirit of the law. It cannot, indeed, have come into the mind of the legislator to transform our tribunals into academies, and to confide to our judges the duty of deciding that this is art and that that is not. Are such powers granted to our judges in the matters of drawing, of painting, and of sculpture; that is, in those departments which are certainly regulated by the law of 1793? Can they say of one painting that it is a work of art, and of another that it has in it nothing artistic? Can they grant protection to the one and refuse it to the other? No; the law is wiser; good or bad, whether it conform or not to the laws of æsthetics, every painting, drawing, and piece of sculpture is a work of art. Thus it was rightly said by M. l'avocat imperial Thomas, in the conclusions which we gave above, that it is impossible to avoid this alternative; either refuse the title of artistic works to all photographs, or grant it to all; outside of that there is only room for arbitrariness, and, consequently, for danger, as well for the judge as for the litigant.

"Let us now come to the reasons which, in our estimation, justify the second theory. The law of 1793 is a general law; we think we have shown that: it protects, as we have seen, every production of the mind, provided it be connected with the fine arts; and we have admitted, in common with all authors, that a casting, even of a natural object, comes under the provisions of the law. How, after that, could we exclude photography? What impresses the adversaries of our theory is that, in photography, the apparatus plays so important a role,—even the preponderant role. What does that show? If the painter, after having conceived his picture, should find the means of reproducing it on the canvas with one stroke, just as he conceived it, would it be denied that his work was a production of the mind? What matters the greater or less rapidity and ease of the execution? Is it not the conception, however expressed, which constitutes the artistic work? The photographer conceives his work; he arranges the accessories and play of light; he arranges the distance of his instrument according as he wants, in the reproduction, either distinctness or size; thus, also, he obtains this or that effect of perspect-

ive. After that, what matters the rapidity, the perfection, the fidelity of the instrument with which he executes what he has conceived, arranged, created? We have said many times already that the author's right was derived from the creation which gives to the work its character of individuality. Is this individuality lacking here? Is it not certain that two photographers, reproducing, each for himself, the same scene or the same model, will obtain two pictures capable of being distinguished? There is, therefore, a creation in the juridical sense of the word. The argument which we have used in an analogous question may be used here: Suppose the discovery of the photograph to have remained secret; its inventor presents the copies obtained by its process, without disclosing the mystery; he allows it to be believed that this copy is obtained by some improvement in the ordinary process of printing and engraving. Would any one think of denying his right? Would not this copy be put in the same category as other copies, and would the protection of the law be unhesitatingly granted to it? Why change opinions because the process of photography is known? Has its work not remained the same? Has it lost anything of its personal character?

"It is almost useless to add—so evident is it—that our theory has the advantage of respecting the rights of each person; for if the photographer has the property in his proof, his property does not go beyond that, and everybody is none the less free to reproduce the same subject. Why not leave to him the property in the work which he has conceived and executed? Why encourage the piracy of his rivals? What good does society derive?"

DESCRIPTIVE ADVERTISEMENTS. It was adjudged in England in 1872 that there could be no copyright in a descriptive advertisement, illustrated or otherwise, of articles which any one might sell.[1] In that case an upholsterer had published an illustrated furnishing guide, with engravings of the articles of furniture which he sold, and descriptive remarks thereon. A bill was filed to restrain another upholsterer from publishing, for the purpose of his own trade, a similar work, in which many of the said engravings were alleged to be copied. And it was held that he could not be restrained from copying illustrations which were merely descriptive of his stock, or of common articles of furniture. Lord ROMILLY, M. R., declared: "At the last it always comes round to this: that, in fact, there is no copyright in an advertisement. If you copy the advertisement of another, you do him no wrong, unless in so doing you lead the public to believe that you sell the articles of the person whose advertisement you copy." In a case decided two years afterwards,[2] it appeared that a cemetery stone-mason employed and remunerated a person to collect monumental designs, and published a book containing sketches of such designs, with scarcely any letterpress. It was held that a tradesman who employed another, for remuneration, to compile a book of designs for him, was himself entitled to copyright in the book, and that a book in the nature of an advertising catalogue might be the subject of copyright. The distinction between the two cases seems to be that in the latter case the subject-matter was a book, which had a value as a book of reference, while in the former case it was a simple catalogue of articles offered for sale.

In this country it was held [3] that an advertising card, devised for the purpose of displaying paints of various colors, "consisting of a sheet of paper having attached thereto square bits of paper painted in various colors, each square having a different color, with some lithographic work surrounding the squares advertising the sale of the colors," was not the subject of copy-

---

[1] Cobbett v. Woodward, L. R. 14 Eq. 407.
[2] Grace v. Newman, L. R. 19 Eq. 623.

[3] Ehret v. Pierce, 10 Fed. Rep. 553; S. C. 18 Blatchf. 302.

right. "True, it has lithographic work upon it," said BENEDICT, J., "and also words and sentences; but it has none of the characteristics of a work of art, or of a literary production. It is an advertisement, and nothing more. Aside from its functions as an advertisement of the Morris paints, it has no value." .

In a subsequent case it was decided, in the circuit court for the southern district of New York, that a chromo, which was a meritorious work of art, might be copyrighted, though designed and used for gratuitous distribution as an advertisement for the purpose of attracting business.[1] It was designed, said the court, as a symbolic glorification of lager-beer drinking. In the center was a conspicuous figure of King Gambrinus, his left arm resting upon a keg of lager, the right holding up a foaming glass of beer. On either side of him were a dozen figures of persons representing various classes in life, into whose eager hands his page was distributing the beer. "This chromo, by its subject, its brilliant coloring, its excellent finish, and the artistic grouping of its figures, forms a striking picture, suitable for hanging in saloons, and well calculated to draw attention to the plaintiff, whose name is printed in large type beneath the figures as a person engaged in the lager-beer business, and constituting, therefore, a valuable mode of advertising." The distinction between this case and that of *Ehret* v. *Pierce, supra,* and *Cobbett* v. *Woodward, supra,* lies in the fact that it was not a mere print or engraving of an article offered for sale. It was in itself a work of the imagination, possessing artistic qualities. And the court laid down the proposition that when the work in question was clearly one of artistic merit, it was not material whether the person claiming the copyright expected to obtain his reward directly through a sale of the copies, or indirectly through an increase of profits in his business, to be obtained through their gratuitous distribution.

PRINTS. In *Rosenbach* v. *Dreyfuss,*[2] the question was whether "prints of small balloons, with printing for embroidery and cutting lines," and "prints of hanging baskets, with printing for embroidery and cutting lines," were subject to copyright. The form of the different parts of the balloon was marked out with lines showing how the paper was to be cut to make the different parts fit together, so as to construct of them a balloon, and with marks showing how and where they might be embroidered. It was held not subject to copyright as being a "print," within the meaning of the statute. "It (the word 'print') means, apparently, a picture; something complete in itself, similar in kind to an engraving, cut, or photograph. It clearly does not mean something printed on paper, that is not intended for use as a picture, but is itself to be cut up and embroidered, and thus made into an entirely different article, as a balloon or hanging basket." It was also held that they did not come within the clause, "models or designs intended to be perfected as works of the fine arts."

PROTECTION LIMITED TO NATIVE ART. The claim has been recently advanced that the act of 1870 (Rev. St. § 4952) authorizes a citizen or resident of this country, if he be "proprietor" of any book, map, print, etc., to obtain a copyright therefor, although the author, inventor, or designer was an alien. The literal reading of the section of the act does not require that both the "author" and the "proprietor" shall be citizens or residents of the United States. Owing to the peculiar phraseology of the statute, it was claimed that as to "paintings, drawings, chromos, statues, statuary, and models," a "proprietor" might obtain a copyright, though the artist or author was an alien. But the court held that such a holding would involve a reversal of the policy of the government from its foundation, to protect American artists and

1 Yuengling v. Schile, 12 Fed. Rep. 97.              2 2 Fed. Rep. 217.

authors only; and that the word "proprietor," as used in the copyright laws, ment the representative of an artist or author who might himself obtain a copyright.[1]                                        HENRY WADE ROGERS.

[1] Yuengling v. Schile, 12 Fed. Rep. 97.