## Case No. 1,076.

### BARTLETT v. CRITTENDEN et al.

[5 McLean, 32;[1] 7 West. Law J. 49.]

Circuit Court, D. Ohio. Nov. Term, 1849.

LITERARY PROPERTY—DEDICATION — COPYRIGHT—INJUNCTION TO RESTRAIN INFRINGEMENT.

1. An author has a common law right in his manuscript, and is entitled to an injunction to restrain the publication of it.

[Cited in Boucicault v. Fox, Case No. 1,691; The Mark Twain Case, 14 Fed. 731; Henry Bill Pub. Co. v. Smythe, 27 Fed. 926. See, also, Wheaton v. Peters, 8 Pet. (33 U. S.) 591, 656; Little v. Hall, 18 How. (59 U. S.) 165; Keene v. Wheatley, Case No. 7,644; Parton v. Prang, Id. 10,784.]

2. But when the work is published, the author has not, by the common law, an exclusive right to re-publish it.

[Cited in Parton v. Prang, Case No. 10,784; The Mark Twain Case, 14 Fed. 730. See, also, Wheaton v. Peters, 8 Pet. (33 U. S.) 591; Keene v. Wheatley, Case No. 7,644; Keene v. Kimball, 16 Gray, 549; Pulte v. Derby, Case No. 11,465.]

3. Since the statute of Anne, the author has no exclusive right to republish his work in England.

4. The first publication is a dedication of the work to the public.

5. The common law gives protection to the author for his manuscript only.

6. But the 9th section of the copyright act of 1831, [4 Stat. 438,] also protects the author's right to his manuscript.

7. The whole of the manuscript need not be printed. If a substantial part of it be taken, chancery will enjoin its publication, on the application of the author, or his legal representatives.

8. The novelty of a work on book-keeping, must necessarily consist in the plan or mode of keeping accounts. The items of debt and credit are only used to illustrate the principle of the work.

9. Private letters are within the statute, and their publication will be restrained.

10. The author's property in the manuscripts may be transferred, or abandoned, like any other right of property.

[In equity. Bill by R. M. Bartlett to restrain A. F. Crittenden and others from infringement of copyright. Injunction granted.]

Walker & Kebler, for complainant.
Storer & Gwynne, for respondents.

OPINION OF THE COURT. This bill is brought to protect the copyright of the complainant, in a manuscript work on book-keeping, of which he claims to be the author; and the defendant is alleged to have published a work on the same subject, which the complainant charges was copied from his manuscript. For twelve years and upwards, the complainant has been engaged in teaching the art of keeping books, and has used his work, which is still in manuscript, in his school, with the view of rendering it more perfect, and with the intention of publishing it. The work of the defendant contains two

[1] [Reported by Hon. John McLean, Circuit Justice.]

hundred and seven pages, ninety-two of which are alleged to have been taken from the plaintiff's manuscript, with only colorable alterations. The answers deny the allegations in the bill.

A reference was made to a master, with special instructions, who reports, "that the book of the respondents contains a portion of plaintiff's manuscript, with only slight alterations; and he says that it is impossible that the book and the manuscript could have been composed by two persons, neither having for his guide the entries of the other. The balance sheets are the same in both. As regards the plan and arrangement, they are the same. The book contains explanations, which are valuable to the learner, that are not in the manuscript. Both works consist of a series of brief sets of mercantile books by double entry." The master reports, that the plan of the work in the manuscript and in print, is substantially the same; that in the book there are explanations interspersed through the series of sets, which the manuscript does not contain; that these explanations are of great use to the learner, but that they may be verbally given with equal advantage. The system in the manuscript, the master states, is superior to any he has seen, except that of the book published by the defendant, which is the same in substance, "that, unlike all the systems he had seen, the manuscript is made up of a few brief sets of mercantile books, which show the entire process of ordinary double entry book-keeping, and in a compass of very little magnitude;" and he says, that "he discovers in other treatises nothing bearing a resemblance to the manuscript plan. He therefore concludes that the plan is original." "The manuscript, in its present state, (the master says,) contains substantially a system of book-keeping, suitable to be used by a teacher in his school." "As the system, when published, becomes its own teacher, it should be accompanied with such precise explanations as may be necessary to a proper understanding and use of it by the uninitiated. It should also be accompanied with forms of the auxiliary books."

Jonathan Jones, of St. Louis, a witness, states, that in 1841 he opened a school in St. Louis, as the partner of the complainant, for instruction in book-keeping on Bartlett's plan, which consists "of eleven sets of books, with a balance sheet for each set, and an inventory attached, showing property on hand, and that Bartlett was the author of them; that his manuscript contains a perfect system of book-keeping, and differs from all others in arrangement, being composed of short exercises." The defendant, Crittenden, entered the school, ignorant of book-keeping; and after completing the course, he took charge of the writing department for a short time. In 1846, Crittenden called on the witness with a copy of his work, which, on examining, the witness found to be Bartlett's

system. And Crittenden then told him, that when he was in Bartlett & Co.'s school, he took a precise copy of the manuscript, with the view of publishing it; and that he did publish it in 1845. And the witness says, if all of Bartlett's manuscript were struck from Crittenden's book, there would not be enough left for a title-page. A copy of Bartlett's manuscript was used at the St. Louis school, and witness never prohibited any of the learners from copying it. Crittenden knew that it was Bartlett's manuscript, and that he intended to publish it as soon as he could make the necessary arrangements. Witness has heard Bartlett frequently say so. Witness gave Crittenden a letter to Bartlett, referring to the published work, that Bartlett might see it. To Josiah Bliss, a witness, Crittenden said, that his system was the same as Bartlett's. Nine other witnesses, who are book-keepers, being sworn, state, that Bartlett's system of book-keeping is new; and that its plan and arrangement are preferable to any other. And they say that Crittenden's book is the same in substance.

On the part of the defendant, James T. Annan was sworn, who says that he has been a book-keeper for fifteen years,—has examined Bartlett's system, and finds nothing new or original in it, either in the forms of stating the accounts, or in the arrangement, or in any particular; that the materials are not new in matter or form; nothing could be taught by it without rules and explanations, and auxiliary books; and that it is wholly unfit for publication; that a cash book is essential to a complete system, and that Bartlett substitutes for it a cash account. The individual who conducts the business is not named in the exhibit, and there are no indexes. Richard Miller, who has been a book-keeper for twenty-five years, agrees with the statement of Annan, and adds, that in Bartlett's plan, there is properly no day-book, only a waste-book, from which to make the day-book entries. John Gundry has been a book-keeper and teacher for seven years, and he agrees with Annan. He says Bartlett has more sets than usual; but he had used the same, or about the same number, more or less. Bartlett's plan contains no definition of terms, such as drafts, bills of exchange, acceptances, &c.,—no mercantile forms, such as bills receivable and payable, account of sales, account current, &c.,—no forms of calculations, viz: interest, discount, commission, equation of payments, reduction of currencies. But he says, that no work has come to his knowledge wherein the theory has been carried out to so great an extent as in Bartlett's, though many authors have recommended it. He never saw the identical entries until the spring of 1842, when he examined Bartlett's manuscript. In 1845, witness united with Bacon to teach book-keeping, who had been using Bartlett's system, and they continue to use it in the school.

The complainant claims relief on two grounds: 1. At common law. 2. Under the act of congress 3d February, 1831, [4 Stat. 438.]

In the case of Wheaton v. Peters, 8 Pet. [33 U. S.] 655, the supreme court say: "That an author, at common law, has a property in his manuscript, and may obtain redress against any one who deprives him of it, or by improperly obtaining a copy, endeavors to realize a profit by its publication, cannot be doubted." And again, page 661, "An author has, by the common law, a property in his manuscript; and there can be no doubt that the rights of an assignee of such manuscript would be protected by a court of chancery." In combating the argument in the same case, that an author had a common law right to republish his own works, and to prohibit others from doing so, the court showed that after the statute of Anne there was no such right in England, and that if such right were shown to exist there, it did not follow that it exists to the same extent in Pennsylvania. That the common law in this country exists in the different states, as modified by them by statutory enactments and judicial decisions. But the question under consideration is very different from the one decided in the above case. We have to say whether the writer has a right of property in his own manuscripts. That he has such a property in his own literary labor, until he shall relinquish it by contract or by some unequivocal act, would seem to be clear. This is laid down in Maugh. Lit. Prop. 74, 137; Webb v. Rose, 4 Burrows, 2330; Pope v. Curl, 2 Atk. 342; Manley v. Owen, 4 Burrows, 2329; Southey v. Sherwood, 2 Mer. 435; 2 Story, Eq. Jur. § 943. Lord Mansfield, and some others, distinguished for their great learning and ability, have considered the publication of a work not as such a dedication of it to the public by the author at common law, as to deprive him of an exclusive right to republish it. With the greatest respect for these opinions, we think there is a difference in principle between the right to republish a printed work, and the exclusive right of an author to publish his own manuscript. A man may write without any intention to publish. He may treat of principles and characters without restraint—with a view to his mental improvement, or from some other motive, without incurring any responsibility so long as the manuscript remains unpublished. It is, therefore, essential, in all proceedings for a libel, to prove publication. And there is no law which can compel an author to publish. No one can determine this essential matter of publication but the author. His manuscripts, however valuable, cannot, without his consent, be seized by his creditors as property. They are valueless to all the world except to the author and his representatives; or to such persons as he shall transfer them. But the author who publishes his work, dedi-

cates it to the public. He voluntarily incurs all the responsibility of a publisher. His object is to instruct or amuse mankind, and the more his work is circulated, the greater is the compliment to his ability as a writer. There is no reason, then, against a republication of the work by any one, except that it may reduce the profits of the author. And, on this ground, he cannot complain, as he has failed to secure the right under the statute. If the common law protects the rights of an author, as contended for, the statute was useless. An action for damages and an injunction, would as effectually protect the rights of an author, as any provisions of the statutes. But there is another view, which is still more conclusive, against the exclusive right to republish a printed work. The statute limits the right to a term of years. The common law right, if it exist, is without limitation. To hold, then, that there is a common law right, independently of the statute, is to disregard the statute. Whilst the common law protects the right of the author to his manuscripts, it cannot be made to extend to the republication of a published work. As well might it be contended that the inventor of a machine, after it has gone into general use, by the acts of the inventor, may, by the common law, claim the exclusive right of making and selling it. But we think this case is within the act of congress referred to. The section 9 of that act—4 Pet. St. 438, [4 Stat. 438]—provides: "That any person or persons who shall print or publish any manuscript whatever, without the consent of the author or legal proprietor first obtained, shall be liable to suffer, and pay to the author or proprietor, all damages occasioned by such injury, to be recovered by a special action on the case founded on this act." "And the several courts of the United States empowered to grant injunction to prevent the violation of the rights of authors and inventors, are hereby empowered to grant injunctions," &c.

That the complainant is the author of the manuscript in question, is proved. And it also appears, from the statement of the experts, and by the reports of the master, that the manuscript contains a new and useful system of bookkeeping. The novelty consists in the mode of keeping accounts. It can consist in nothing else. The names and figures used in the items of debit and credit, are of no importance; as they are only used to illustrate the mode or principle of the work. The manuscript was contained on different sheets or cards, for the convenience of teaching; but this is immaterial. Its parts were necessarily connected. Three or four of the witnesses state that there is no novelty in the manuscript — nothing that had not been taken from, or might not be found in different works on book-keeping. But this is contrary to the views of the witnesses generally, and, especially, to the report of the master. The objection that the manuscript does not contain a complete system, as explanatory notes, &c., are necessary and usual in such works, to enable the student to learn the art of book-keeping without an instructor, is not sustainable. A surreptitious publication of an important part of the manuscript, is equally within the principle of the statute. But the notes are only explanatory of the system, as contained in the body of the work. They facilitate the progress of the learner, but they add nothing to the system. From the weight of the evidence, including the master's report, Bartlett's system may be said to be complete for the purpose of teaching. Was there a publication of the manuscript of the complainant by the defendant? He has denied in his answer, somewhat equivocally, the charge of publication, as made in the bill. He confessed to Jones, that he took a copy of the manuscript, with a view of publishing it, and that he did publish it in 1845. After the publication of his book, he admitted, to other witnesses, that the system of his work was the same as Bartlett's. It seems Crittenden became a student in the school of Bartlett and Jones, conducted by Jones at St. Louis, and in which he acquired his knowledge of bookkeeping. The manuscript of Bartlett was used in that school, and it was there that the defendant made out his copy.

Independently of this proof, a comparison of the book with the manuscript, will show that at least ninety-two pages of the book were substantially copied from the manuscript. The master says that they could not be the production of two minds. So nearly are they identical, that no one can read them without at once perceiving that one must have been copied from the other. The system is the same in both, and the discrepancies that appear only show the intent of the copyist. It is believed that there is no case in the books where the piracy is more palpable. The inconsistency of Jones in giving a letter to Crittenden, recommending him and his book to Bartlett; is explained in his testimony. He gave the letter to bring the fact of publication to Bartlett's notice. This act of the witness, though apparently inconsistent with his statements, does not destroy his credibility. He must have known, as he states, that the book contained Bartlett's system; but it was not for him to say, or to know, whether Crittenden, under the circumstances, was liable to an action for the publication. The facts of the case go strongly to show the probability that Crittenden told Jones, as he swears, that he copied Bartlett's manuscript.

It is argued, to bring the case within the ninth section, that the whole of any manuscript must be published; that the principle of law in relation to colorable alterations of a printed book, or a fair abridgment of it, does not apply under this section to a manuscript. If the whole of the manuscript must be published, will the omission of a line or

a word, evade the statute? That it will, would seem to be the argument of the counsel. Under such a construction, the question might well be asked, of what value to an author is the statute? It purports to protect him against a fraudulent use of his manuscript; but practically it gives him no protection. It has been passed in mockery of his right. He is the sport of every man who has the disposition and the opportunity to pirate his manuscript. No such rule of construction is admissible. Has a substantial part of the manuscript been published? Does the book of the defendant contain Bartlett's system of book-keeping? Of this there can be no doubt. Such a publication is within the above section. It renders the manuscript valueless.

Was there an abandonment of the manuscript by Bartlett? This is the only remaining point to be considered, and it is the one most relied on in the defence. It satisfactorily appears from the evidence, that Bartlett intended to publish his manuscript. And this is only material on the question of abandonment. His right of property in no way depends on his intention in this respect. His manuscript was used in the school taught by himself in Cincinnati, and by the partnership school taught by Jones in St. Louis. In both these schools the manuscript was studied by the pupils, and they were required to copy certain parts of it, and were at liberty to copy the whole. These schools, and especially the one at Cincinnati, have been in operation several years. And under these circumstances, it is contended, there was an abandonment of the manuscript.

Bartlett's right of property in his manuscript may be transferred or abandoned, the same as any other right of property. Where the copy-right of a published work is secured, under the statute, the author, by using the work in imparting instruction to his pupils, or by disposing of it to a friend, does not thereby transfer his exclusive right to publish it, or incur a suspicion that he intends to abandon it. And how does this differ from the case under consideration? In both cases the law gives a right of property to the author, and a remedy to enforce that right. And in both cases he may transfer or abandon that right. The evidence of a transfer or abandonment must be as clear and as specific in the one case as in the other. An acquiescence in the publication of his manuscript, or in the republication of his printed book, would authorize the presumption of an assignment or of an abandonment. To make a gift of a copy of the manuscript is no more a transfer of the right or abandonment of it, than it would be a transfer or an abandonment of an exclusive right to republish, to give the copy of a printed work. In his treatise on Equity, (section 943,) Mr. Justice Story says, "In cases of literary, scientific, and professional treatises in manuscript, it is obvious, that the author must be deemed to possess the original ownership, and be entitled to appropriate them to such uses as he shall please. Nor can he justly be deemed to intend to part with that ownership by depositing them in the possession of a third person, or by allowing a third person to take and hold a copy of them. Such acts must be deemed strictly limited, in point of right, use, and effect, to the very occasions expressed or implied, and ought not to be construed as a general gift or authority for any purposes of profit or publication, to which the receiver may choose to devote them." And he says, to prevent the publication of manuscripts, without the consent of the author, an injunction should be issued. Even the publication of private letters by the person to whom they were addressed, may be enjoined. This is done upon the ground that the writer has a right of property in his letters, and that they can only be used by the receiver for the purposes for which they were written. So far as this, and, in justification or defense, an individual has an interest in letters received by him. Eden, Inj. c. 13, pp. 275, 276; Duke of Queensberry v. Shebbeare, 2 Eden, 329; Southey v. Sherwood, 2 Mer. 435, 436; Macklin v. Richardson, Amb. 694; Pope v. Curl, 2 Atk. 342; Lord Perceval v. Phipps, 2 Ves. & B. 19, 24; Gee v. Pritchard, 2 Swanst. 403, 415, 422, 425. "No length of time will authorize the publication of an author's original manuscript without his consent." In 1804, the court of sessions of Scotland interdicted, at the instance of the children, the publication of the manuscript letters of the poet Burns. Cadell v. Stewart, 1 Bell, Comm. 116n. Lectures, oral or written, cannot be published without the consent of the lecturer, though taken down when delivered. Manuscript reports were copied by the clerk of a gentleman, to whom the author had lent them, and the chancellor granted an injunction to restrain the publication. Forrester v. Waller, 2 Eden, 328; Eden, Inj. 322. The earl of Clarendon delivered to defendant's ancestor, the manuscript of the second part of his father's History of the Rebellion, with liberty to take a copy of it, and make what use of it he thought fit. Complainant, who was Lord Clarendon's representative, obtained an injunction from Lord Northington, who said, that it could not have been the donor's intention that the donee should print the work, though he might make every use of it except that. Duke of Queensberry v. Shebbeare, 2 Eden, 329. Lord Eldon refused to grant an injunction, until the right was tried at law, where the manuscript had been in the hands of a publisher twenty-three years, and had not been called for by the plaintiff. Southey v. Sherwood, 2 Mer. 435. Sparks had procured, from the representatives of Washington, the right of publishing his letters and other writings, and had done so in twelve volumes. Upham, in his Life of

Washington, had taken many of these letters from Sparks, they never having been published before. On a bill filed, Mr. Justice Story said: "Unless there be a most unequivocal dedication of private letters and papers by the author, either to the public or some private person, I hold that the author has a property therein, and that the copyright thereof exclusively belongs to him." And he granted an injunction. Folsom v. Marsh, [Case No. 4,901.] The manuscript of Bartlett was used in his school at Cincinnati, and in the school at St. Louis, for the purpose of imparting instruction to the pupils, and it does not appear, from the evidence that copies were required or permitted to be taken of it for any other purpose. There is nothing in the testimony from which an implication can arise, that Bartlett consented to the publication of his manuscript by the defendant, or that he ever abandoned it. It seems he was much excited when he was informed of the publication of Crittenden, and, shortly afterwards, instituted this suit.

An injunction will be granted to restrain the defendants from a further publication of the first 92 pages of the work, or sale of it; and a reference is made to a master to ascertain the number of copies sold, and the number on hand, &c., and that he report at the next term.

[NOTE. For prior litigation between the same parties involving the same subject-matter, see Bartlette v. Crittenden, Case No. 1,082.]