PRESS PUB. CO. v. MONROE.

(Circuit Court of Appeals, Second Circuit. March 12, 1896.)

1. COPYRIGHT—AT COMMON LAW—EFFECT OF STATUTES.
    The passage by congress of the copyright statutes has not abrogated the common-law right of an author to his unpublished manuscript.

2. SAME—SALE OF MANUSCRIPT—RESERVATION OF RIGHTS.
    Plaintiff, in 1891, entered into an agreement with the managers of the World's Columbian Exposition to write a poem, to be delivered at the dedicatory exercises of the Exposition. She wrote the poem, and, after submitting it to the proper officers of the Exposition corporation for their approval, which it obtained, she received, from the corporation $1,000, and gave a receipt therefor "in full payment for ode composed by me," such receipt also providing that the corporation should have the right to furnish copies to the press for publication, and copies for free distribution, and to publish the poem in the official history of the dedication; subject to which concessions plaintiff reserved her copyright therein. After this transaction, but before the publication of the poem by plaintiff or the Exposition corporation in any way, defendant, the publisher of a newspaper, without the consent and against the will of the plaintiff and the corporation, obtained a copy of the poem, and published the same in its newspaper. Held that, by the terms of the receipt given to the Exposition corporation, plaintiff retained, until the poem should be published by the corporation in one of the specified ways, her common-law right to control the publication of her poem, and the unauthorized pub-

lication by defendant was an infringement of such right, for which plaintiff was entitled to recover damages.

**3.** EXEMPLARY DAMAGES—INFRINGEMENT OF COPYRIGHT—WANTONNESS.

It appeared from the evidence that defendant, whose newspaper was published in New York, after it had secured a copy of the poem through its agent in Chicago, was informed that the publication of the poem was forbidden on the ground that it was copyrighted; that defendant made inquiries of its agent, and, on learning that the copy in his possession bore no copyrighting words, telegraphed its agent that it would take the chances on the publication. Defendant's managing editor testified that he knew the poem belonged to the Exposition; that he made no inquiry of that corporation as to his right to buy it; that he believed he had the right, under some circumstances, to publish a literary work without the owner's consent; that his conduct in publishing the poem had never been blamed, and, so far as he knew, had been ratified, by the defendant corporation. *Held*, that it was not error to instruct the jury that, if they found the circumstances showed wanton disregard of the plaintiff's rights, they might award exemplary damages, and that a verdict for such damages was justified.

**4.** SAME—PECUNIARY DAMAGE UNNECESSARY.

The right to award exemplary damages, in a proper case, is not dependent, in the federal courts, upon the proof of actual pecuniary damage.

In Error to the Circuit Court of the United States for the Southern District of New York.

This case comes here on writ of error to review a judgment of the circuit court, Southern district of New York, entered December 19, 1894, upon a verdict for $5,000 in favor of defendant in error, who was plaintiff below. The action was for damages for unlawfully publishing in the World newspaper a poem written by the plaintiff to be delivered on the occasion of the dedication of the Columbian Exposition, or World's Fair, in Chicago. The facts appear in the opinion.

John M. Bowers, for plaintiff in error.

Geo. H. Yeaman, for defendant in error.

Before PECKHAM, Circuit Justice, and WALLACE and LACOMBE, Circuit Judges.

LACOMBE, Circuit Judge. At the time when preparations were being made for the opening ceremonies of the World's Fair, or Columbian Exposition, in Chicago, plaintiff, a resident of that city, who was engaged in the literary profession, had published poems and prose writings, and had an excellent reputation as an authoress, was invited by the committee on ceremonies to write and deliver a poem at the dedicatory exercises. That invitation was given March, 1891. The dedicatory exercises were had on October 21, 1892, in the presence of a vast concourse of people. They included the delivery of addresses by orators of well-known ability. No effort was spared to make them effective, and they were, by reason of the event which they commemorated, of exceptional interest to the country at large. For the public utterances of orator or poet who had been selected to speak on that day and in that place, the occasion was unique. The plaintiff accepted the invitation, and after many months of careful work produced an ode of some 400 lines. After it had been shown to the committee on ceremonies, and suggestions made as to changes,

she revised it, reducing its length to about 375 lines, and delivering the final revised version to the committee on September 20, 1892. Fifty-six lines of the ode were lyrical songs, intended to be sung. The original version of the ode was shown to a Mr. Chadwick, who wrote the music for these songs, and the 56 lines were published with the music so composed, in order to properly rehearse the chorus. Except of these 56 lines, there had, down to this time, been no publication of the ode by the plaintiff or by any one else. The copies which were given to the members of the committee on ceremonies and to a so-called "literary committee" were delivered to them solely to enable them to decide whether the poem was one suitable and worthy of their acceptance as the ode to be delivered at the opening exercises. Such a delivery of copies of a literary production is not a publication, and could not prejudice the owner's.common-law rights. Bartlette v. Crittenden, 4 McLean, 300, Fed. Cas. No. 1,082; Id., 5 McLean, 32, Fed. Cas. No. 1,076.

On September 23, 1892, plaintiff met the acting chairman of the committee on ceremonies, who informed her that the poem was satisfactory, and the matter arranged, and paid her $1,000, whereupon she signed the following receipt:

"Received, Chicago, the 23rd day of September, 1892, from the World's Columbian Exposition, one thousand dollars ($1,000) in full payment for ode composed by me.

"It is understood and agreed that said Exposition company shall have the right to furnish copies for publication to the newspaper press of the world, and copies for free disposition, if desired, and also may publish same in the official history of the dedicatory ceremonies; and, subject to the concession herein made, the author expressly reserves her copyright therein.            "Harriet Monroe."

The first question to be determined—and it is the important question in the case—is what property rights to the ode remained to the plaintiff after September 23, 1892. The evidence indicates that the receipt quoted above expressed, item by item, the conditions of the contract between Miss Monroe and the committee, which was not otherwise reduced to writing. The defendant contends that by the first clause of this receipt she transferred to the committee her entire common-law right of property in the manuscript; that the residue of the receipt is a nullity; that it cannot be construed as impairing in any way the full rights of ownership given by the first clause; that the second paragraph was intended only as a reservation of the right to take out a copyright under the United States statute, and was powerless to secure even that, since publication without the statutory copyright notice is authorized, and, the poem being once thus published, all right to restrain future piracy would be lost. We are unable to accept this construction. The whole instrument is to be construed together, and manifestly it contemplates something short of a complete transfer of all right to the committee. A reservation by the author, "subject to the concession herein made, * * * of her copyright in the poem," imports a reservation of common-law as well as of statutory copyright, and it must be made clear, either upon the face of the instrument itself or otherwise by competent proof, that the word "copyright" was used in

some more restricted sense. To the committee was given not only the right to have the poem delivered on the occasion of the dedicatory ceremonies, but also the right to publish it in the official history thereof, and the right to furnish copies for publication to the newspaper press of the world, and the right to furnish copies for free distribution. This was all the committee needed for its purposes, and, having secured all it needed, there is nothing surprising in its leaving all other rights to the author. When the committee chose to avail of its concession, and publish the poem, that act would terminate the common-law copyright, but until publication that right survived, and by the terms of the agreement was not conveyed to the committee, but reserved to the author. Any unauthorized publication would be a trespass upon that right of property, and right of action therefor would still be in the author.

The contention of the plaintiff in error that the passage by congress of the copyright statutes has abrogated the common-law right of an author to his unpublished manuscript is unsupported by authority. These statutes secure and regulate the exclusive property in the future publication of the work after the author shall have published it to the world. But this is a very different right from the ownership and control of the manuscript before publication. "That an author, at common law, has a property in his manuscript, and may obtain redress against any one who deprives him of it, or, by improperly obtaining a copy, endeavors to realize a profit by its publication, cannot be doubted. * * * The argument that a literary man is as much entitled to the product of his labor as any other member of society cannot be controverted, * * * [at least until] he shall have sold it publicly." Wheaton v. Peters, 8 Pet. 657, 658. And that common-law right may be enforced in the federal courts whenever diversity of citizenship gives those courts jurisdiction of the parties, irrespective of whatever additional means of redress are provided by section 9 of the act of congress of February 3, 1831, now section 4967, Rev. St. U. S. See Bartlette v. Crittenden, 4 McLean, 300, Fed. Cas. No. 1,082; Id., 5 McLean, 32, Fed. Cas. No. 1,076; Keene v. Wheatley, 9 Am. Law. Reg. 33, Fed. Cas. No. 7,644; Palmer v. De Witt, 47 N. Y. 532. The various assignments of error, therefore, which cover both the refusal of the court to direct a verdict in favor of defendant and also so much of the charge as instructed the jury that plaintiff had property rights which would be trespassed upon by an unauthorized publication of her ode, are unsound.

On September 23d—the day when the money was paid and the receipt signed—the New York World, a newspaper published by defendant, received a telegram from one Fay, its agent in Chicago, saying that a copy of the ode could be obtained for $150, and asking whether it should be paid, and the ode procured. On the next day the managing editor of the World directed its purchase, and ordered it sent that afternoon and night to the World by telegraph. While the ode was in transit, a message was received from the Associated Press to the effect that it was understood that a copy of the ode had gotten out somehow, and that its publication was forbidden, on the ground that it was copyrighted. Fay was thereupon communicated

with, and replied that the copy which he had did not have any copy-righting words upon it, and that there was no indication upon it that it was copyrighted.    Thereupon, and on September 24th, the following dispatch was sent to Fay in Chicago:

"We will take our chances on it.    Interview Miss Monroe to-morrow, and get a good talk with her about ode and literature generally.    Explain to her that the World could not miss an opportunity to give the public such a grand poem, and tell her how much better to have the World treat it as it will to-morrow, making it the great feature of the day, than to have it peddled around among the little papers.                                                  The World."

The ode was printed in full in the issue of the paper of Sunday, September 25th, with comments upon it, a sketch of Miss Monroe, and what purported to be a portrait of her.    Fay was not put on the witness stand, nor was any evidence offered to show how the copy which he bought had been obtained.    The court instructed the jury that if they found "it was obtained and sold to the defendant against the mind and will and without the authority and consent of both the Exposition company and Miss Monroe, the act of publication was a wrongful violation of her rights," and that "upon that issue the plaintiff had the burden of proof."    The jury were further instructed that in actions of trespass to personal property, or in actions for injury to personal property, when the circumstances showed gross or wanton or malicious disregard by the defendant of the rights of the plaintiff, the jury would have a right to give exemplary damages in excess of any actual loss which was suffered.    The testimony in the case warranted the jury in finding that the defendant had reason to know that the poem had not theretofore been published; that it was the wish and intention, both of the Exposition committee and of the plaintiff, to withhold it from publication until, in the language of the circuit judge, "it should be presented to the audience with all the advantages which the enthusiasm of the occasion could give, and unmarred by criticism or comment, either polite or impolite."    The managing editor testified that he knew the ode belonged to the World's Fair, and that he made no inquiry of the World's Fair committee as to whether he had any right to buy it or not; that as to the question whether an editor of a newspaper has the right to publish a literary work unless the owner consents to it, he left that matter to be settled by the lawyers; and added, "Under some circumstances, I believe that I have the right, as an editor, to publish the manuscript of a person without that person's consent."    This is a restatement of the proposition so frequently advanced, when newspapers happen to be defendants, that the person or property rights of individuals are entitled to receive no consideration at the hands of the public press whenever a violation of those rights may, in the opinion of the editor, promote the entertainment of the purchasers of his paper. Testimony such as this was abundantly sufficient to warrant the jury in finding that the publication of the plaintiff's ode in the World newspaper was the result of "that wanton and reckless in-difference to the rights of others which is equivalent to an intentional violation of them."    Railroad Co. v. Arms, 91 U. S. 489.    In view

of the testimony of the principal witness for the defendant, it seems to have escaped on this occasion with a light verdict.

Plaintiff in error contends that the court erred in instructing the jury that it might award exemplary damages. That in certain classes of cases juries are authorized to give punitive or exemplary damages to punish a wrongdoer and to deter others from the commission of a like wrong is well-settled law in the federal courts and in the courts of this state. Day v. Woodworth, 13 How. 370; Railroad Co. v. Arms, 91 U. S. 489; Voltz v. Blackmar, 64 N. Y. 440. In such cases exemplary damages may be given in addition to what may be proved to be the actual money loss of the plaintiff. It is contended, however, that when no actual damages are proved, exemplary damages should not be allowed. In support of this proposition three cases are cited from the Texas Reports, but the law of that state is peculiar on the subject of exemplary damages (Sedg. Dam. § 359, and cases there cited), and its decisions inapplicable where a different law prevails. Of the other cases cited on the brief, Graham v. Fulford, 73 Ill. 596, was an action on a special statute. Kuhn v. Railroad Co., 74 Iowa, 141, 37 N. W. 116; Stacy v. Publishing Co., 68 Me. 287; and Maxwell v. Kennedy, 50 Wis. 649, 7 N. W. 657,—sustain the contention of the plaintiff in error. They are, however, plainly at variance with the theory upon which exemplary damages are awarded in the federal courts, namely, as something additional to, and in no wise dependent upon, the actual pecuniary loss of the plaintiff, being frequently given in actions "where the wrong done to the plaintiff is incapable of being measured by a money standard." Day v. Woodworth, supra; Wilson v. Vaughan, 23 Fed. 229. There is room for argument against the allowance of exemplary damages at all as anomalous and illogical. Some courts have held that it is unfair to allow the plaintiff to recover not only all the loss he has actually sustained, but also the fine which society imposes on the offender to protect its peculiar interests. But if it be once conceded that such additional damages may be assessed against the wrongdoer, and, when assessed, may be taken by the plaintiff,—and such is the settled law of the federal courts,—there is neither sense nor reason in the proposition that such additional damages may be recovered by a plaintiff who is able to show that he has lost $10, and may not be recovered by some other plaintiff who has sustained, it may be, far greater injury, but is unable to prove that he is poorer in pocket by the wrongdoing of defendant.

Several passages in the charge dealing with the question of exemplary damages were excepted to, and are set out in the assignment of errors; but, since no argument in support of such exceptions is found in the brief, and none was made on the hearing, no discussion of them need be had in this opinion. They seem to be without merit.

Plaintiff in error cites authorities as to nonliability of a corporation for exemplary damages except under special circumstances. Presumably this is in support of his request to charge, "Malice cannot be imputed to an incorporation for the acts of its agent unless it has advised or ratified the same," which request was refused. The

court, however, charged that "a corporation cannot be made liable for exemplary damages for the acts of its employés unless it has itself directed the acts or ratified them." This was certainly all the defendant was entitled to on that branch of the case. The court stated to the jury, and error is assigned to such statement, that "Mr. Chamberlain [the managing editor] was asked, and replied in the negative, if he had ever been blamed or found fault with for his conduct; and he was also asked if his conduct had been ratified by the managers of the corporation, to which he replied that it had been, so far as he knew." This was an accurate statement of the evidence. The court in no way indicated what weight should be given to it, but left it to the jury to consider as proof which the plaintiff claimed showed a ratification. In this there was no error. Approval of the conduct of the particular editor who had directed the publication tended to prove ratification of his acts.

Exception was taken to the statement in the charge that the copy of the ode was obtained by defendant against the mind and will of the author. The evidence abundantly warranted such a statement. Exception was also taken to the statement that "the Columbian Exposition committee desired to keep this ode secret until the day of its delivery." This exception is frivolous. The court merely rehearsed the testimony of the officers of the committee on that point, and added that upon that evidence and the other proofs in the case it was contended by the plaintiff that the ode was obtained surreptitiously, and without intent of the Exposition company, leaving it to the jury to determine that question.

We are at a loss to understand from the record upon what theory the defendant supports its claim that there was harmful error in admitting in evidence any part of Exhibit 4 (a copy of the Sunday World of September 25, 1892) except the ode. When this paper was offered, defendant objected that there appeared in it the ode, and also some comments on the ode, and a picture of Miss Monroe, which defendant contended were irrelevant. No Exhibit 4 is presented here. The record states that the plaintiff, then on the witness stand, "read the first column of the article down to and including the words, 'This is set to music, and ends with the line, "And love shall be supreme,"' and then continued reading to and including the words, 'The ode is published for the first time exclusively in the World to-day,' and then read the ode as published in the World." The only exhibit we find in the record answering to this description, in that it contains the lines quoted, comments on the ode, the ode itself in full, and a portrait of Miss Monroe, is a document marked "Defendant's Exhibit No. 1," which was, without objection, read in evidence by defendant's counsel, and marked, during the direct examination of defendant's managing editor. Whether a paper put in evidence during the examination of a witness shall be read by counsel or by witness is a matter of practice in the court below, which will not be reviewed on appeal. In allowing plaintiff thus to read the article in the World and her own copy of the ode, the trial judge committed no error. The conversations with Fay, the Chicago representative of the World, who interviewed plain-

tiff on the morning of the day of publication under instructions from defendant, were proper as tending to show knowledge on the part of defendant's agent that the poem had not been published by author or committee, and was to be withheld from publication until the day of dedication.

There are many other assignments of error; some to the admission of evidence, others to parts of the charge, or to refusals to charge defendant's requests. We have examined them all, but find in them no ground for reversal. Since they have not been discussed either in the brief of counsel or upon the oral argument. it is unnecessary to give them any fuller discussion here. The judgment of the circuit court is affirmed.