### WAGNER et al. v. CONRIED et al.

(Circuit Court, S. D. New York. November 24, 1903.)

1. CONTRACTS—PUBLICATION OF OPERA—MODIFICATION.
   A contract by the composer of an opera, ceding to certain publishers the exclusive right to publish the opera for all countries, reserving only the acting right, except with regard to concerts, was not modified, as to the publisher's right to publish the entire work, by a subsequent agreement between the publisher and the composer's heirs, by which the acting right was relinquished to the publishers as to concerts, and the right to render complete or slightly abridged performances of the work in concert style was restored to the composer's heirs.

2. SAME—RESERVATION OF ACTING RIGHT—EFFECT—WHAT LAW GOVERNS.
   The effect of the publication of a German opera, and offering the same for sale in the United States, with a reservation of the acting right to the heirs of the composer, is to be determined by the laws of the United States.

3. SAME—DEDICATION TO PUBLIC.
   Where the publishers of a German opera entitled to the exclusive publication of the same under a contract reserving the acting rights to the composer's heirs published and offered complete copies thereof for

promiscuous sale in the United States, they thereby dedicated the opera to the public, depriving them or the composer's heirs of the right to restrain theatrical production thereof.

This cause comes here upon a motion for a preliminary injunction to restrain the production on the stage of the Metropolitan Opera House, New York City, of the opera of Parsifal.

Hanes & Judge, for complainants.

Dittenhoefer, Gerber & James and Alexander & Colby, for defendants.

LACOMBE, Circuit Judge. The answers to the main questions raised by this motion are found in written documents so plainly expressed as to require no oral testimony for their interpretation.

On September 16, 1881, at Bayreuth and at Mainz a written contract was entered into between Richard Wagner and the publishing firm of B. Schott's Sons, of Mainz. By it "Richard Wagner cedes to the publishing firm B. Schott's Sons the exclusive right of publication for all countries, of his musical dramatic work Parsifal—a stage festival play—the absolute possession of the composition and the libretto of the said work having already been transferred to the firm of B. Schott's Sons on November 17, 1877." The defendants contend that the German words here translated "absolute possession" should be translated "unconditional ownership." The result is the same, whichever translation be accepted. The contract further provides that "for this transfer the firm of B. Shott's Sons pays to Herr Richard Wagner the sum of 75,000 marks in the following way: 40,000 marks after this engagement has been drawn up, 20,000 marks on December 31, 1882, 15,000 after the fiftieth performance of Parsifal. Besides, the firm of B. Schott's Sons cancels in its books the remainder of Richard Wagner's debt, amounting to 2,500 marks." The contract concludes with this clause: "The acting right of Parsifal in regard to the theatres is preserved to Herr Richard Wagner, whereas in regard to concerts he formally resigns it in favour of the firm of B. Schott's Sons."

It is unnecessary to inquire what were Richard Wagner's intentions on entering into this contract. Its language is clear, precise, and unambiguous, and it must be assumed that parties who thus express themselves in written contracts intend what they express. This contract did not make B. Schott's Sons merely the agent of Richard Wagner to introduce his "musical-dramatic work" to the world, reserving to him the power to regulate the time, place, manner, and extent of such introduction. For a valuable consideration he transferred to them the exclusive right of publication for all countries, and all that such publication implies. He did reserve the acting right in regard to theaters, and it is understood that under the law of Germany a publication of the entire work, coupled with a notice to the effect that acting rights are reserved, secures such rights to the composer's family for a certain number of years after his death. If, therefore, on the day he gave to B. Schott's Sons the exclusive right of publication coupled with this reservation, he had himself published the work in Germany with a like reservation,

he would not have lost the acting right in that country. The effect of publication of the whole work, accompanied by such reservation, in some country other than Germany, is to be determined by the law of that country. The contract gave B. Schott's Sons the right to publish in any country, giving notice at the same time of what Wagner undertook to reserve, and such publication, when made under this contract, is to be given the same effect as if it had been made by Wagner himself with like notice of reservation.

Subsequently to Richard Wagner's death, possibly before there had been any publication, even in Germany, of the entire work, this original contract, September 16, 1881, was modified by a contract between his heirs and the firm of B. Schott's Sons. This second contract is dated October 29, 1884. It recites that by the first contract "Herr Richard Wagner has formally resigned, in favour of the firm of B. Schott's Sons, the acting right of Parsifal as to concerts." The heirs relinquish 15,000 marks of the consideration named in the first contract, and the parties agree as follows:

"That this right [i. e., the acting right as to concerts], as far as it regards the complete performances of the work as an oratory [oratorio], or only little abridged performances in concert-style, is restored to Richard Wagner's heirs. On the other hand the right of disposing of the work for the performance of fragments in concerts is left to the firm of B. Schott's Sons; by this, however, the possibility that a manager is entitled to perform successively fragments, unpublished as yet, in common with fragments already published: prelude (Vorspiel), then transformation music (Verwandlungsmusic) and end of the first act and Good Friday's spell (Harfreitagszauber) must not be afforded."

This quotation has been given at length, in the translation given by complainants' witnesses, because it is contended that this second contract has so modified the first one as to restrict the right of publication therein conveyed. It is thought that the language last above quoted conveys no such meaning. It seems most clearly to be concerned solely with performances at concerts, leaving to B. Schott's Sons the right of performance of fragments, but reconveying to the heirs the right of performance of the whole work, either complete as an oratorio, or in some abridged form, which, although cut more or less, still preserves the symmetrical form and spirit of the work. There is nothing in the record which qualifies in any way the right of publication sold and transferred to B. Schott's Sons by the contract of September 16, 1881.

With B. Schott's Sons' publication of Parsifal in Germany we are not concerned. A large single-volume quarto edition of the full score, with words and stage directions, was issued and sold under certain agreements with the purchasers as to nonperformance on the stage. In 1902 the firm printed a duodecimo edition in three volumes, and sent a number of copies to their New York agent, G. Schirmer, by whom they were offered for sale to whomever would buy, and several copies were actually sold. The fact of publication of this edition is beyond dispute. There was not merely a distribution of a limited number of copies to selected individuals for a special purpose, as was the case in Press Publishing Co. v. Monroe, 73 Fed. 196, 19 C. C. A. 429, 51 L. R. A. 353. They were so offered that

"the public, without discrimination of persons, had an opportunity of enjoying them." Upon the title-page of each copy of this duodecimo edition thus sold appears the following notice: "This copy must not be used for production on the stage"; but it is the well-settled law of this country that if the publication is complete such notice is ineffective to reserve the very right which such publication dedicates to the public.

The complainants contend that the smaller edition is incomplete; concededly the quarto contains the entire "orchester partitur," or score of the "musical-dramatic work." The testimony, however, is overwhelming to the contrary. In the 12mo there has been some mechanical condensation. For example, "the first page of the Vorspiel in the original edition has one staff for the first fagotte and another staff for the second and third fagotte, while in the smaller edition the three fagottes are condensed into one staff," and there are instances of like treatment of the score for other instruments; but this seems in no way to affect the orchestration, nor to leave out a single note or bar of music. The three volumes contain the score of Parsifal completely and fully, nothing is missing, no bar, measure, stage directions, or explanations contained in the larger edition are omitted therefrom. The orchestration is not changed or abridged, and the score is in no respect garbled or mutilated. It can be used to extract therefrom the different orchestra parts, and the parts for the artists, singers, chorus, and musicians. It also contains the libretto. In view of such a publication, neither the composer nor his heirs can insist that performance be enjoined.

It is further contended that by reason of certain transactions in which Conreid and one Goldmark, an alleged partner, participated, he should be estopped from performing Parsifal. As to that branch of the case the facts are in dispute, and it should not be decided upon ex parte affidavits.

The motion is denied.