## AMERICAN LAW BOOK CO. v. CHAMBERLAYNE.

(Circuit Court of Appeals, Second Circuit.   December 15, 1908.)

LITERARY PROPERTY (§ 7*)—RIGHT TO CONTROL PUBLICATION—SALE BY AUTHOR.
Plaintiff contracted to write an article on the law of evidence, and to deliver the same for a stated compensation to defendant for publication in its Cyclopedia.  Defendant was to become owner of the copyright, plaintiff reserving only the right to make use of the material and memoranda collected by him in any manner which did not infringe upon or interfere with such copyright.  Plaintiff wrote and delivered only part of the article, and defendant revised and completed the same, and published it with a truthful statement of authorship and editorship.  *Held* that, when the manuscript was written and delivered under such contract, plaintiff ceased to be the owner of the literary property therein, and could not maintain an action for trespass thereto because of the manner in which the article was published.

[Ed. Note.—For other cases, see Literary Property, Dec. Dig. § 7.*

Rights of authors to control of publication, disposition, or use of their productions, independent of statutory copyright, see note to Bobbs-Merrill Co. v. Straus, 77 C. C. A. 620.]

In Error to the Circuit Court of the United States for the Eastern District of New York.

This cause comes here upon writ of error to review a judgment against plaintiff in error for $2,500 and costs.  The cause was tried by the court without a jury.  The testimony being closed, the trial judge stated that he thought he should go upon the record in order to avoid any questions as to findings of fact, and proceeded to set forth his views as to the pleadings and evidence (somewhat in the form of a charge), and concluded that the company should pay the sum of $2,500.  The facts are sufficiently stated in the following opinion.

W. B. Hale and Edmund Wetmore, for plaintiff in error.

F. H. Field, for defendant in error.

Before LACOMBE, COXE, and WARD, Circuit Judges.

LACOMBE, Circuit Judge.  The plaintiff below was an attorney at law, with a favorable reputation as an author and an authority upon the law of evidence.  Defendant was the publisher of the Cyclopedia of Law and Practice, known as "Cyc."  On October 1, 1902, they entered into a written contract, the material parts of which are as follows:

Plaintiff agreed to furnish to the defendant an article entitled "Evidence," to be published in the Cyclopedia, and to write said article in conformity with a certain annexed schedule of requirements (Clause I).  He further agreed that the said article, if accepted by the company, may be published by it in the Cyclopedia in the name of Mr. Chamberlayne in the company's customary style, to wit: "By Charles F. Chamberlayne" (Clause II).  Plaintiff further agreed "that the company shall become the sole owner of the copyright of said article, Mr. Chamberlayne reserving the right to make use of the material and memoranda collected and used by him in the preparation of said article and of any ideas embodied in said article, provided such use shall not in any manner infringe or interfere with the copyright of

said article 'Evidence' written and prepared by him for the Company" (Clause III). He further agreed that the article should be so constructed when delivered to the company as to constitute when printed as nearly as practicable not more than 1,000 pages all told, including and excluding such matters as were directed by the schedule; that the article when delivered to the company should be finished for the printer, and should be a piece of good professional work; that the article should be completed and delivered on or before January 1, 1904, and that, in case of failure so to deliver it, the damages should be fixed at $5 a day for every day it should remain unfinished and undelivered (Clause VII).

The company reserved to itself "the right to reject said article or any part of said article provided the same does not in its opinion come up to the proper standard or does not constitute a reasonable compliance with the terms of this contract; and in case said article, or part of the same is rejected, it is hereby mutually agreed that Mr. Chamberlayne shall receive no compensation for the said article, or part thereof, so rejected; and if in the opinion of the company alterations or changes are necessary to make the said article conform in substance, style, or form to the required standard, and it is deemed expedient to have the said alterations or changes made in the home office of the company, the lowest actual cost of making said alterations or changes shall be deducted from the amount which otherwise would be due to Mr. Chamberlayne" (Clause VIII). Plaintiff further agreed that, in case of his death or disability whereby he might become incapacitated for the full performance of the contract, the company should have full permission to take possession of and complete the manuscript of said article, which, when so completed, might be published in his name in the Cyclopedia (Clause IX).

The company agreed to pay him for the said article prepared in conformity with the above conditions $5,000, subject to certain deductions for clerical or editorial assistance as might be mutually agreed upon (Clause X). The company further agreed that all memoranda of cases and other material used or designed for the writing of said article by or for Chamberlayne should remain at all times his property, but that the same should not, without the consent of the company, be removed from its possession; and that it should have a lien on the same to secure the company in the event of his death or permanent disability prior to completion of the article (Clause XII). It further agreed to furnish him with suitable deskroom, assistants, etc. (Clause XIII).

The article was not completed by January 1, 1904, but neither party to the contract, at that time or any other, attempted to rescind it because of any alleged breach by the other. At that time plaintiff had worked upon only the first half of the article, and even that portion was not in a fully completed state. The time was extended by mutual assent, and plaintiff continued working at the article until February 27, 1905. During this period there was much friction between the parties. Defendant insisted that it was manifest the whole article would not be completed by plaintiff within such time as to enable it to publish the volumes in which the same was to appear, and there-

fore employed four other persons to complete it, each writing one of the last four sections. The plaintiff eventually completed and revised 13 sections, and these he actually delivered to the defendant, and himself asserts that the manuscript as prepared and written by him and delivered to defendant, with certain incidental changes and additions made by other persons acting under the direction of defendant, constitutes the first 13 sections of the article "Evidence" as printed and published by defendant in the Cyclopedia.

The defendant published the first 10 sections in volume 16 of "Cyc." They are entitled:

"Evidence.

"By Charles F. Chamberlayne, Charles C. Moore, Wm. Lawrence Clark, A. S. H. Bristow, Hiram Thomas, and Joseph Walker Magrath."

An asterisk calls attention to a note at the foot of the page, which reads:

"The author and editor of particular sections are indicated in a foot-note at the beginning of each section. The entire article was revised and edited by Charles C. Moore and Wm. Lawrence Clark."

An asterisk at the title of each of the 10 sections calls attention to a note at the foot of the page, which reads:

"By Charles F. Chamberlayne. Revised and edited by Wm. Lawrence Clark" (or in some instances "by Wm. Lawrence Clark and Charles C. Moore").

The remainder of the complete article on Evidence was published in volume 17 of "Cyc." with similar headings and footnotes, except that, in connection with the last four sections, plaintiff's name does not appear, the note giving the name of the author who wrote it, e. g. "By A. S. H. Bristow, Revised and Edited by Charles C. Moore and Wm. Lawrence Clark."

The injury of which plaintiff complains is, as averred in the complaint, that the publication "has confused plaintiff's work with that of others, which in important particulars differs from plaintiff's views on those subjects; has rendered the article as a whole, i. e., the whole 17 sections, variable in style, imperfect and unsymmetrical in arrangement; and subjects plaintiff to the unnecessary inference of incompetency to deal adequately with the subject as a whole." Also that the publication "so joins the names of persons other than the plaintiff as editors and revisers * * * as to suggest the inference * * * that his said article was unfit for publication in defendant's series except upon substantial changes and corrections made by persons previously unknown to the legal profession, in connection with the subject 'Evidence,' and so confuses, blends, and intermingles the plaintiff's work with that of others as to prevent him from receiving the public credit which would otherwise accrue to him." Also that, by omissions of statements and authorities which he had written or desired to add to his manuscript, the portion published was rendered "incomplete, unscientific, and inaccurate."

The cause having been tried without a jury, the findings of fact by the court are to be given the same force and effect as would be given to the verdict of a jury. The trial judge found that "the uncontradict-

ed evidence shows consent by the plaintiff to the publication of the manuscript 'Evidence' delivered by him to the defendant, and that the only actual damages which can be assessed, when allowed, are such as grow out of the manner of publication." That there "is no evidence of actual, damage," and "nothing shown in the sense of studied desire to injure the reputation of the plaintiff." The statements in the two volumes as to authorship, revising, and editing of the different sections were strictly truthful.

Whatever unfair treatment the plaintiff may have received during his employment under the contract, and afterwards by the manner in which his manuscript was published—and we are not to be understood as expressing any opinion as to whether or not there was any unfair treatment—we are satisfied that he cannot recover in this action. The trial court erred, as we think, in giving too broad a construction to the former opinion of this court in Press Publishing Co. v. Monroe, 73 Fed. 196, 19 C. C. A. 429, 51 L. R. A. 353. If the evidence warranted it, a party to such a contract as that above set forth might recover damages sustained by reason of the other party's doing or omitting to. do something he had agreed to omit or to do. But the plaintiff has elected not to sue upon the contract. If he has sustained damage because his article has been published in a mutilated or altered form or with some misrepresentation as to its authorship, he may, if he can prove his allegations, recover in an action for libel. But this is not an action for libel; plaintiff's counsel so states on page 2 of his brief. The whole theory of the case is that plaintiff has never parted with his literary property in the 13 sections, and that therefore he can maintain "an action for trespass to literary property by the unwarranted, unauthorized, and unlawful publication of plaintiff's manuscript without his consent."

The authority relied upon in support of this proposition is Press Publishing Company v. Monroe, supra. In that case Miss Monroe had written a poem to be delivered at the dedicatory exercises of the World's Fair or Columbian Exposition in Chicago. Copies of the manuscript had been shown to members of the literary committee which had the matter in charge, to enable them to determine whether or not the poem was worthy of the occasion. This, of course, did not operate as a publication. The committee approved her poem and agreed to pay her $1,000 for the privilege of reading and publishing it on October 21, 1892, the date fixed for the dedication exercises. The agreement between them is quite precisely evidenced by the following document:

"Received Chicago, the 23d day of September, 1892, from the World's Columbian Exposition, $1,000 in full payment for ode composed by me. It is understood and agreed that said Exposition Company shall have the right to furnish copies for publication to the newspaper press of the world and copies for free disposition if desired, and may also publish same in the official history of the Dedicatory Ceremonies; and subject to the concession herein made, the author expressly reserves her copyright therein."

The date fixed for dedication exercises was October 21st. In some way or other, without the consent of Miss Monroe or the Exposition Company, the New York World on September 23d secured a copy of

the poem. It was notified that the poem was protected by copyright, and publication was forbidden, but published it in full in its issue of September 25th, for which tortious act it was sued by Miss Monroe. This court held that by the plain language of the contract she had reserved to herself the common-law as well as the statutory copyright; that the contract did not contemplate a complete transfer of all rights to the committee; that all that was conveyed was the right to do certain things which, when done, would operate to prevent the taking out of statutory copyright and would destroy all right to restrain future piracy.

The contract in the case at bar is a very different one. Plaintiff reserved to himself only the right to retain and make use of material and memoranda collected by him, and to make use of any of his ideas, provided such use shall not interfere with the copyright of the article written and prepared by him for the company (articles III and XII). He agreed that the company should become the sole owner of the copyright of said article, when it was written and delivered; and subsequently he wrote and delivered it. Under these circumstances he was not the owner of the literary property, nor entitled to maintain this suit for a trespass upon such property.

The judgment is reversed.